[No. F047372. Fifth Dist. Apr. 5, 2006.]

WAL-MART STORES, INC., et al., Plaintiffs and Appellants, v.
CITY OF TURLOCK et al., Defendants and Respondents.

COUNSEL

Sagaser, Jones & Hahesy, Timothy Jones, John P. Kinsey; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Jeffrey D. Dintzer and Gregory D. Brown for Plaintiffs and Appellants.

Jarvis, Fay & Doporto, Rick W. Jarvis and Benjamin P. Fay for Defendants and Respondents.

OPINION

DAWSON, J.—The City of Turlock (City) adopted a zoning ordinance that prohibited the development of "big box" retail stores containing a full service grocery department. Wal-Mart Stores, Inc., and Wal-Mart Real Estate Business Trust (collectively, Wal-Mart) challenged the validity of the ordinance, claiming City unconstitutionally exceeded its police powers and failed to comply with the California Environmental Quality Act (CEQA).[1] The superior court ruled the ordinance was a valid exercise of police power and was not subject to further environmental review under CEQA because enactment

___

[1] Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code unless otherwise indicated.

of the ordinance was not a "project" for purposes of CEQA and, alternatively, various exemptions applied.

We conclude that (1) a city may exercise its police power to control and organize development within its boundaries as a means of serving the general welfare, (2) City made a legitimate policy choice when it decided to organize development using neighborhood shopping centers dispersed throughout the city, (3) the ordinance was reasonably related to protecting that development choice, and (4) no showing was made that the restrictions significantly affected residents of surrounding communities. Accordingly, the restrictions in the ordinance bear a reasonable relationship to the general welfare and, thus, City constitutionally exercised its police power.

Also, we conclude that further environmental review under CEQA is not necessary because the zoning amendments were consistent with City's general plan and were covered adequately by the prior environmental impact report (EIR) prepared for the general plan. (Cal. Code Regs., tit. 14, § 15183, subd. (i).)[2] Specifically, the administrative record does not show any reasonably foreseeable *project-specific changes* in the environment that are significant and *peculiar to* the zoning amendments or their site. In less technical language, it is too soon for the detailed environmental analysis urged by Wal-Mart. The impacts Wal-Mart wants analyzed are more closely related to later activities and thus are not peculiar to the adoption of the zoning amendments and, consequently, Guidelines section 15183 allows the detailed environmental analysis to be deferred until those later activities are begun.

We publish this opinion because no other published opinion has upheld the approval of a project based on the application of the provisions in Guidelines section 15183.[3] (See *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359 [43 Cal.Rptr.2d 170] [approval of residential development project reversed; on remand, city could consider whether project was partially covered by § 21083.3].)

## FACTS AND PROCEEDINGS

In early 2003, Wal-Mart began taking steps to develop a site containing a Wal-Mart Supercenter. Wal-Mart asked City officials to identify entitlements and any development impact fees City would require in connection with a

---

[2] Title 14, section 15000 et seq. of California Code of Regulations hereafter will be referred to as the Guidelines.

[3] Its parallel provision in CEQA is section 21083.3. (See generally Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (10th ed. 1999) pp. 511–517 (Remy).) We discuss Guidelines section 15183 instead of the statutory provision because that is the way the parties presented their arguments to this court.

development in the vicinity of State Route 99 and Tuolumne Road. City responded to Wal-Mart in May 2003 by identifying development entitlements and estimating development impact fees applicable to the proposed project.

Wal-Mart contends that City staff initially encouraged Wal-Mart to proceed with its application but began to modify its position in late July 2003, and, by mid-August, City first announced that it would require a conditional use permit (CUP) and an EIR for the proposed Wal-Mart Supercenter project. City disputes this claim of "encouragement" but acknowledges that, in August 2003, representatives of unions and existing local supermarkets began meeting with and lobbying members of the city council to prevent the development of "big box" stores containing grocery departments.

Wal-Mart also contends that City staff notified Wal-Mart representatives on September 18, 2003, that, at its next regularly scheduled meeting, the city council would consider an ordinance proposal that would effectively prohibit the development of a Wal-Mart Supercenter within City's jurisdiction.

At the September 23, 2003, meeting, the city council unanimously passed a motion directing City's planning commission to prepare and present a proposed zoning ordinance that would limit the ability of "big box" retailers to sell nontaxable items such as groceries.

City staff prepared proposed zoning and specific plan amendments that would require a CUP for the development of certain large-scale retail stores and would prohibit "discount superstores," which are defined as retail stores of greater than 100,000 square feet that devote more than 5 percent of sales-floor area to nontaxable items such as groceries. On November 20, 2003, the planning commission met, reviewed the draft ordinance, and recommended its approval.

In an agenda report to the city council dated December 9, 2003, City's planning manager stated the concern as follows: "Discount superstores compete directly with existing grocery stores, many of which anchor neighborhood-serving commercial centers. Many smaller stores within a neighborhood center rely upon the foot traffic generated by the grocery store for their existence. In neighborhood centers where the primary grocery store closes, vacancy rates typically increase and deterioration takes place in the remaining center. For instance, the tenants in the Turlock Town Center have been adversely impacted by the closure of Albertson's and the entire center lacks its former vitality. For the residents surrounding Turlock Town Center, longer trips are now necessary to acquire day-to-day consumer goods. [¶] The

proposed zoning ordinance amendment is intended to preserve the city's existing neighborhood-serving shopping centers that are centrally located within the [neighborhood] . . . . This distribution of shopping and employment creates a land use pattern that reduces the need for vehicle trips and encourages walking and biking for shopping, services, and employment. [¶] In short, the proposed amendments are intended to protect grocery stores in existing neighborhood centers to prevent a significant change in land use, employment and traffic patterns throughout the city. [¶] . . . [¶] A significant concern with discount superstores is that they combine neighborhood-serving retail [grocery] in a more remote, regional-serving retail center, such as along State Highway 99. This means that local residents are forced to drive further for basic services for groceries, causing a shift in traffic patterns, and potentially overburdening streets that were not designed to accommodate such traffic. . . ."

In a letter dated November 20, 2003, Wal-Mart's law firm set forth various grounds for its opposition to the proposed ordinance. One ground asserted in the letter was that a Wal-Mart Supercenter was the best option when considering vehicle trips and the attendant environmental impacts of congestion and air pollution. To support this assertion, the letter included a study by Kimley-Horn and Associates, Inc., an engineering, planning, and environmental consulting firm (Kimley-Horn), and a report by TJKM Transportation Consultants (TJKM). The Kimley-Horn analysis estimated that a Wal-Mart Supercenter would generate significantly fewer vehicle trips than a multi-tenant shopping center containing the same facilities. The TJKM report considered four scenarios: (1) a 220,000 square-foot Wal-Mart Supercenter that used 60,000 square feet for groceries, (2) a 160,000 square-foot Wal-Mart Discount Store with an unattached 60,000 square-foot supermarket nearby, (3) a shopping center with a 60,000 square-foot supermarket as an anchor tenant and a total of 220,000 square feet of floor area, and (4) a 160,000 square-foot discount club, such as a Costco, with an unattached 60,000 square-foot supermarket nearby. The TJKM report opined that, because the Wal-Mart Supercenter would generate fewer vehicle trips than the other scenarios, it also would result in less traffic growth and less traffic congestion.

Wal-Mart's law firm submitted another letter on December 16, 2003, restating Wal-Mart's opposition to the proposed ordinance and urging its rejection. The letter emphasized Wal-Mart's position that there was substantial evidence that the ordinance might have a significant effect on the environment and that, therefore, an environmental review was required under CEQA. To support this position, the letter stated the report by TJKM concluded "in part that a Wal-Mart Supercenter would result in anywhere from 19,160 to 51,921 fewer trips per week compared with the situation as it would exist absent a Wal-Mart Supercenter."

The December 16, 2003, letter also included (1) a December 15, 2003, letter from an air quality and noise specialist with Jones & Stokes, who used the TJKM report as the basis for concluding that the construction of a Wal-Mart Supercenter would have less impact on air quality than alternative developments and (2) a December 15, 2003, letter from real estate developer and broker Mehmet Noyan, who opined that there was "considerable justification" for the four development scenarios used in the TJKM report. Noyan also stated that, in his opinion, "it is more likely than not that a large supermarket of the type currently being operated by Winco and Food Maxx is the most probable occupant for the real property that is the subject of the Wal-Mart Supercenter proposal, if the . . . Supercenter is prohibited by the City."

The December 16, 2003, letter included a section addressing "blight" and asserted that there was no evidence that the construction of the proposed Wal-Mart Supercenter would result in blight within City.[4]

■ At its meetings on December 16, 2003, and January 13, 2004, the city council accepted the planning commission's recommendation and adopted Ordinance No. 1015, which amended City's zoning regulations, and Ordinance No. 1016, which made parallel amendments to City's Northwest Triangle Specific Plan (collectively, the Ordinance). The Ordinance defined "Discount Store," "Discount Superstore" and "Discount Club."

"Discount stores" are "stores with off-street parking that usually offer a variety of customer services, centralized cashing, and a wide range of products. They usually maintain long store hours seven (7) days a week. The stores are often the only ones on the site, but they can also be found in mutual operation with a related or unrelated garden center or service station. Discount stores are also sometimes found as separate parcels within a retail complex with their own dedicated parking." A "discount superstore" is defined as a discount store that exceeds 100,000 square feet of gross floor area and devotes at least 5 percent of the total sales floor area to the sale of nontaxable merchandise, often in the form of a full-service grocery department. A "discount club" is defined as "a discount store or warehouse where shoppers pay a membership fee in order to take advantage of discounted prices on a wide variety of items, such as food, clothing, tires, and appliances; many items are sold in large quantities or bulk."

---

[4] Though the parties use the term "blight," we will follow the lead of *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1204, and footnote 4 [22 Cal.Rptr.3d 203] and use the term "urban/suburban decay" in our analysis.

The Ordinance requires developers of discount stores and discount clubs to obtain a CUP before constructing such stores. The development of discount superstores within City is not permitted under the Ordinance. The following recitation of facts was included in the Ordinance:

"**WHEREAS**, the Turlock General Plan (including, but limited to policies 2.4-a, 2.4-g, 2.4-h, 2.4-j, 2.4-k) establishes locational requirements for the [regional and neighborhood] retail centers: encouraging a number of neighborhood centers equally dispersed throughout the city while encouraging a concentration of regional shopping centers along the Highway 99 / Countryside Drive corridor; and

"**WHEREAS**, General Plan policies promote and encourage vital neighborhood commercial districts that are evenly distributed throughout the city so that residents are able to meet their basic daily shopping needs at neighborhood shopping centers; and [¶] . . .

"**WHEREAS**, given the changes in the retail sector and the evolution toward ever-bigger stores, it is necessary that the zoning ordinance be amended to regulate larger retail establishments appropriately and to afford them adequate review; and

"**WHEREAS**, the Turlock zoning ordinance (Title 9 of the Turlock Municipal Code) has not kept pace with the evolution of the retail sector and fails to adequately distinguish the size, scale and scope of various retail activities; and [¶] . . .

"**WHEREAS**, the establishment of discount superstores in Turlock is likely to negatively impact the vitality and economic viability of the city's neighborhood commercial centers by drawing sales away from traditional supermarkets located in these centers; and

"**WHEREAS**, industry and academic studies indicate discount superstores rarely add any retail services currently not provided within a community, and that the majority of sales growth at a discount supercenter comes from a direct shift of dollars from existing retailers within a community, primarily from grocery stores; and

"**WHEREAS**, discount superstores compete directly with existing grocery stores that anchor neighborhood-serving commercial centers; and

"**WHEREAS**, smaller stores within a neighborhood center rely upon the foot traffic generated by the grocery store for their existence and in neighborhood centers where the grocery store closes, vacancy rates typically increase and deterioration takes place in the remaining center; and [¶] . . .

"**WHEREAS**, the [Ordinance's proposed zoning changes] are intended to preserve the city's existing neighborhood-serving shopping centers that are centrally located within the community . . . ; and

"**WHEREAS**, the city's current distribution of neighborhood shopping centers provide convenient shopping and employment in close proximity to most residential neighborhoods in Turlock, consistent with the Turlock General Plan; and

"**WHEREAS**, this distribution of shopping and employment creates a land use pattern that reduces the need for vehicle trips and encourages walking and biking for shopping, services, and employment."

The city council also made findings that the development of a discount superstore within City would concentrate retail traffic around that store's location, which would create traffic congestion in a city that, thus far, had been developed using the concept of neighborhood-based retail centers.

City filed a notice of exemption from CEQA with the Stanislaus County Clerk-Recorder on January 14, 2004, which stated the amendment of the zoning regulations had been determined to be exempt because (1) it was not a public project, (2) the project was consistent with a program EIR, (3) the project was consistent with a general plan, and (4) a categorical exemption relating to the minor alteration of a land use limitation applied.

Four weeks later, Wal-Mart filed a petition for writ of mandate and complaint for declaratory relief that alleged City's approval of the Ordinance violated CEQA, violated state zoning laws, and was an arbitrary, capricious, and unlawful legislative act.

The superior court issued its written decision denying the petition for writ of mandate and the request for declaratory relief on December 7, 2004. The superior court determined (1) that the Ordinance was a proper exercise of City's police power even though it had an anticompetitive effect, and (2) that an initial study was not required because the Ordinance was not a "project" subject to CEQA review and because certain exemptions from CEQA applied.

A judgment in favor of City and awarding it costs was filed on January 10, 2005. Wal-Mart filed a timely notice of appeal.

## DISCUSSION

I. *CEQA Standard of Review*

■ A "preliminary review" is the analysis by which a public agency determines whether CEQA applies to a proposed activity. (*Association for a*

*Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 636 [10 Cal.Rptr.3d 560] (*ACE*).) During a preliminary review, the public agency considers whether the proposed activity is a discretionary project and, if so, whether an exemption from CEQA applies. (*ACE, supra,* at p. 636.) When the preliminary review results in a determination that the proposed activity is a discretionary project that is not exempt, CEQA requires the public agency to proceed with an initial study. (*ACE,* at p. 636; Guidelines, § 15063.) In contrast, when the preliminary review results in a determination that the proposed activity is not a project or is exempt, the public agency's CEQA inquiry ends and it may file a notice of exemption. (Guidelines, § 15062.)[5]

In this case, City determined that the enactment of the Ordinance was outside CEQA's substantive requirements because (1) it was not a "project" for purposes of CEQA, and (2) various exemptions applied. The determinations that result from an agency's preliminary review are subject to judicial review under the abuse of discretion standard contained in section 21168.5, which provides that an " '[a]buse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*ACE, supra,* 116 Cal.App.4th at p. 636.)

For purposes of applying CEQA's abuse of discretion standard, substantial evidence includes "fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact" and excludes "argument, speculation, unsubstantiated opinion or narrative, [and] evidence that is clearly inaccurate or erroneous . . . ." (§ 21080, subd. (e); see Guidelines, § 15384.)[6] Furthermore, evidence is substantial when it provides "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)

II. *Existence of a CEQA Project*

■ Under CEQA, a "project" includes an activity that "may cause . . . a reasonably foreseeable indirect physical change in the environment, and . . . is [¶] . . . directly undertaken by any public agency." (§ 21065, subd. (a).)

---

[5] The filing of a notice of exemption commences a 35-day statute of limitations period for challenges to the decision that the project is exempt. (Guidelines, § 15062, subd. (d).)

[6] The phrase "reasonable assumption predicated upon fact" means a reasonable inference drawn from fact. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 797 [124 Cal.Rptr.2d 731].)

We will assume for purposes of this opinion that the enactment of the Ordinance prohibiting discount superstores within City was a "project" for purposes of subdivision (a) of section 21065. Therefore, we need not resolve a question of statutory construction—to wit, whether subdivision (a) of section 21080 establishes a bright-line rule of law that all enactments of zoning ordinances are discretionary projects regardless of whether all of the requisite elements contained in section 21065's definition of a "project" have been met.[7]

## III. Application of Guidelines Section 15183

 Section 15183 of the Guidelines creates a streamlined environmental review for qualifying projects that are consistent with a general plan for which an EIR was certified. Section 15183 provides in part:

"(a) CEQA mandates that projects which are consistent with the development density established by existing . . . general plan policies for which an EIR was certified shall not require additional environmental review, except as might be necessary to examine whether there are project-specific significant effects which are peculiar to the project or its site. This streamlines the review of such projects and reduces the need to prepare repetitive environmental studies. [¶] . . .

"(i) Where the prior EIR relied upon by the lead agency was prepared for a general plan . . . that meets the requirements of this section, any rezoning action consistent with the general plan . . . shall be treated as a project subject to this section."

---

[7] Sections 21065 and 21080 could be construed to mean that the enactment of a zoning ordinance is not automatically a project and will not be a project unless all of the essential elements for a project contained in section 21065 are met. Under this view, the qualifying language at the beginning of subdivision (a) of section 21080, which states that "[e]xcept as otherwise provided in [CEQA]," would be construed to mean that all of the essential elements for a project contained in section 21065 are "otherwise provided in [CEQA]" and are not eliminated by the language in section 21080 that states discretionary projects include the enactment of zoning ordinances. If such a construction were adopted, courts could not presume that the enactment of a zoning ordinance "may cause . . . a . . . physical change in the environment" (§ 21065), but would have to review the administrative record for evidence establishing both the requisite causal link as well as the requisite physical change in the environment. Under this construction, the main significance of subdivision (a) of section 21080 would be limiting the applicability of CEQA to *discretionary* projects.

This issue of statutory construction has not been raised in a published appellate opinion or in two widely used CEQA treatises. (See 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2005) § 4.21, pp. 172–173; see Remy, *supra*, at p. 78 ["The following are all 'projects' subject to CEQA; [¶] . . . [¶] (3) the enactment and amendment of zoning ordinances"].) The Guidelines, however, have melded the provisions of subdivision (a) of section 21080 into the definition of "project" (see Guidelines, § 15378, subd. (a)(1)) and, thus, appear to have rejected by implication a bright-line rule that all zoning amendments are projects.

The Ordinance contained a section titled "Environmental Determination" that included findings regarding (1) direct and indirect impacts of the change in zoning and (2) the applicability of exemptions from CEQA contained in sections 15061, 15168, 15183 and 15305 of the Guidelines. The finding in the Ordinance regarding the applicability of the streamlined review in Guidelines section 15183 states: "9. That, pursuant to CEQA Guidelines Section 15183, the proposed regulations are consistent with the General Plan, including but limited to: 1) promoting neighborhood-serving commercial centers, 2) dispersing these centers throughout the City, and 3) promoting regional serving commercial centers along the Highway 99 corridor. Furthermore, a program EIR was certified for the General Plan and the [*sic*] all impacts were previously assessed because 1) there are no effects peculiar to this project that were not addressed in the General Plan EIR, 2) there are no effects which were not previously analyzed as significant effects, 3) there are no potentially significant cumulative or off-site effects, and 4) there are no previously identified significant effects, which as a result of substantial new information, are determined to have more severe impacts."

The Ordinance also included a specific finding that "any potential indirect secondary impacts of the proposed amendments on the physical environment are speculative and are not reasonably foreseeable, and are, therefore, not subject to review under CEQA."

Wal-Mart challenges City's reliance on Guidelines section 15183 and the prior EIR covering City's general plan by arguing that the prior EIR analyzed neither significant environmental effects peculiar to the Ordinance nor potentially significant off-site impacts. Wal-Mart does not contend that the Ordinance was inconsistent with the general plan. (See Guidelines, § 15183, subds. (a) & (d)(1)(C) [provisions concerning consistency with general plan]; Gov. Code, § 65860, subd. (a) ["zoning ordinances shall be consistent with the general plan"].)

### A. *Standard of Review for "Piggy-Backing" on Prior EIR*

One dispute between the parties concerns whether the applicability of Guidelines section 15183 should be evaluated under the fair argument standard or the substantial evidence standard. We will assume, without deciding, that the fair argument standard applies to our review of City's determination that the adoption of the Ordinance may be "piggy-backed" on the EIR prepared for its general plan. (See *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at pp. 1373, 1406, fn. 24 [suggesting fair argument standard applies to determination under § 21083.3 that activity is covered by prior EIR].)

Accordingly, the Ordinance will not be covered by the EIR certified for City's general plan if Wal-Mart presents a fair argument regarding the existence of a reasonably foreseeable *project-specific* significant change in the environment that is *peculiar to* the Ordinance or its site. (Guidelines, § 15183, subd. (a).)

■ With respect to the production of evidence, a party that makes assertions based on actions it claims it will take in the future is in the best position to present evidence that shows its plans for that future action. (E.g., *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1584 [27 Cal.Rptr.3d 28] (*County Sanitation*) [sanitation districts presented employee declarations identifying the alternate disposal methods likely to be implemented in response to ordinance banning a type of sludge disposal widely used].) Accordingly, in this case Wal-Mart was responsible for producing evidence to support its assertions regarding how it would respond to the adoption of the Ordinance.

B. *Environmental Effects Peculiar to the Project*

The proper application of the language in Guidelines section 15183 regarding "project-specific significant effects which are peculiar to the project or its site" begins with an understanding of the term "significant effects."

"Effects" must relate to physical change and are categorized as either direct (primary) or indirect (secondary). (Guidelines, § 15358.) When the project is a zoning amendment, few if any direct physical changes will exist. (*City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 250 [227 Cal.Rptr. 899] [evaluating environmental consequences of rezoning involves a focus on secondary effects]; see Guidelines, § 15146 [discussion of secondary effects of zoning amendment need not be as detailed as discussion of effects of specific construction project].) Furthermore, "[a]n indirect physical change is to be considered only if that change is a reasonably foreseeable impact which may be caused by the project. A change which is speculative or unlikely to occur is not reasonably foreseeable." (Guidelines, § 15064, subd. (d)(3).)

Based on these provisions, our evaluation of environmental effects will focus on the reasonably foreseeable indirect physical changes in the environment that may be caused by the adoption of the Ordinance. (See § 21065, subd. (a) [definition of project]; Guidelines, § 15064, subd. (d) [determining significance of project's environmental effects].)

Wal-Mart contends there will be significant environmental effects peculiar to the Ordinance "as it will inevitably lead either to the development of a

multi-tenant shopping center in the place of the proposed Wal-Mart Super-center, or to the development of a Wal-Mart Supercenter outside the City limits, either of which will have negative impacts on traffic and air quality." Accordingly, the possible physical changes in the environment that Wal-Mart asserts may be caused by the enactment of the Ordinance are derived from two sources. First are the physical changes Wal-Mart predicts will result from the possible development of a multitenant shopping center where Wal-Mart initially planned to build its supercenter and thus will result indirectly from the enactment of the Ordinance. Second are the physical changes related to the possible construction of a Wal-Mart Supercenter outside the boundaries of City, which we will regard as potential "off-site impacts" of the kind mentioned in subdivision (b)(3) of Guidelines section 15183.[8]

### 1. Identifying the "change" relevant to CEQA analysis

An analysis of each of these sources of potential physical change in the environment begins with a proper identification of the relevant *change*. Fundamentally, a physical change is identified by comparing *existing* physical conditions with the physical conditions that are predicted to exist at a later point in time, after the proposed activity has been implemented. (*City of Carmel-by-the-Sea v. Board of Supervisors, supra*, 183 Cal.App.3d at pp. 246–247 [effects of rezoning are evaluated against existing physical conditions, not against hypothetical conditions permitted by land use plan].)[9] The difference between these two sets of physical conditions is the relevant physical change.

Using the idea of photographic snapshots to illustrate our point, the baseline environment can be depicted in a snapshot of the physical conditions that exist at the time when the environmental review of the proposed activity begins. Next, an array of snapshots is created by picturing the physical

---

[8] The entirety of subdivision (b) of Guidelines section 15183 provides:

"In approving a project meeting the requirements of this section, a public agency shall limit its examination of environmental effects to those which the agency determines, in an initial study or other analysis:

"(1) Are peculiar to the project or the parcel on which the project would be located,

"(2) Were not analyzed as significant effects in a prior EIR on the zoning action, general plan or community plan with which the project is consistent,

"(3) Are potentially significant off-site impacts and cumulative impacts which were not discussed in the prior EIR prepared for the general plan, community plan or zoning action, or

"(4) Are previously identified significant effects which, as a result of substantial new information which was not known at the time the EIR was certified, are determined to have a more severe adverse impact than discussed in the prior EIR."

[9] Existing physical conditions can be described as "baseline" conditions. (See Guidelines, § 15125, subd. (a) [the environmental setting described in an EIR is the "baseline physical conditions" used to evaluate the significance of an impact].)

conditions that one can reasonably foresee existing in the future.[10] The physical changes that are reasonably foreseeable are the differences between the baseline snapshot and any one of the snapshots depicting future conditions.

One can identify an error in Wal-Mart's analysis of physical change by using this photography illustration. Wal-Mart argues that "the Ordinance will likely result in alternative developments that will have worse environmental effects than the banned Discount Superstores." By comparing alternative developments on one hand with the discount superstores prohibited by the Ordinance on the other hand, Wal-Mart has compared two snapshots of future conditions and failed to use the snapshot of existing baseline conditions. This comparison by Wal-Mart fails to identify the relevant change. Instead, it identifies *changes to the changes*[11] in the physical environment, which is a step removed from the inquiry relevant to CEQA. (See *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 358 [182 Cal.Rptr. 317] [error to compare population capacities designated under existing general plan with population capacities designated in two-area plan proposed as amendments to general plan; the impact of development associated with proposed area plans must be determined by comparing that development with existing physical conditions].)

The correct analysis of the relevant physical change in the environment involves a comparison of (1) the physical conditions that existed at the time the Ordinance was proposed or approved[12] with (2) forecasts of reasonably

---

[10] The process of picturing future conditions can be described as predicting, forecasting or estimating what will occur in the future. (See *County Sanitation, supra,* 127 Cal.App.4th at p. 1586, fn. 43.) An array of snapshots, rather than a single snapshot, is created by this process because (1) more than one set of future conditions are reasonably foreseeable and (2) each reasonably foreseeable development scenario will generate a series of snapshots that represent different times in the future. For example, the air pollution resulting from the growth-inducing impact of building a new sewage treatment plant would not be seen in a series of time-lapse photographs of the growth until enough time had passed for the growth to reach the stage where the resulting pollution could be observed. (See Guidelines, § 15064, subd. (d)(2) [air pollution from growth caused by building a sewage treatment plant used as an example of an "indirect physical change in the environment"].)

[11] This error is similar to the error committed by (1) an accident reconstruction expert who should calculate a vehicle's speed at the instant of impact and instead calculates its deceleration (change in speed) or (2) the mathematician who is asked to use calculus to determine a function's first derivative (its instantaneous rate of change) and proceeds to calculate the function's second derivative (the rate of change of the rate of change). (Britannica Concise Encyclopedia (2006) derivative <http://concise.britannica.com/ebc/article-9362561> [as of Apr. 5, 2006].) In this appeal, Wal-Mart has not attempted to show that the Legislature intended the provisions of CEQA to reach changes to future changes in the environment.

[12] We need not decide whether the appropriate day for establishing the baseline is (1) September 23, 2003, when the city council passed a motion directing City's planning commission to prepare a proposed zoning ordinance, (2) January 13, 2004, when the city

foreseeable future conditions that may occur as a result of the adoption of the Ordinance. As we shall discuss *post*, however, there is insufficient evidence in the administrative record to establish that the physical changes predicted by Wal-Mart are reasonably foreseeable, much less peculiar to the Ordinance.

### 2. *Asserted changes within City*

Wal-Mart claims that the Ordinance "will inevitably lead . . . to the development of a multi-tenant shopping center in the place of the proposed Wal-Mart Supercenter . . . ." In the language of CEQA, this claim can be restated as asserting that the development of a multitenant shopping center at the location proposed for a Wal-Mart Supercenter is a reasonably foreseeable indirect physical change to the environment that may be caused by the enactment of the Ordinance. Thus, according to Wal-Mart's analysis, there are "project-specific significant effects which are peculiar to the project or its site," and the enactment of the Ordinance falls outside the scope of Guidelines section 15183.

### a. *Reasonable foreseeability*

The question whether alleged physical changes are reasonably foreseeable requires an examination of the evidence presented in the administrative record. For example, in *County Sanitation, supra*, 127 Cal.App.4th 1544, this court reviewed the administrative record to identify which alternative methods of disposing of sewage sludge were reasonably foreseeable after the County of Kern prohibited the land application of certain types of sewage sludge within its jurisdiction. We concluded that incineration was a foreseeable alternative disposal method because applicable rules of law allowed it and the administrative record described it as an alternative. (*Id.* at pp. 1583–1584.) Despite being foreseeable, however, the quality and quantity of evidence in the administrative record did not show a reasonable possibility that incineration would be used in the future. (*Id.* at pp. 1585–1587.) The evidence indicated that incineration of sewage sludge was an unlikely alternative because of its negative effects on air quality. As a result, this court concluded that incineration was not a *reasonably* foreseeable alternative method of sewage sludge disposal. (*Id.* at p. 1587.)

In this case, we examine the administrative record to determine whether it includes substantial evidence that the development of a multitenant shopping center at the location Wal-Mart had chosen for its facility is reasonably foreseeable. In this regard, we note, first, that Wal-Mart cites no evidence to support and, indeed, makes no argument either (1) that the Ordinance is the

---

council approved the Ordinance, or (3) a day in between those two dates, because the physical conditions relevant to this case were essentially the same over that period of time.

catalyst for, or part of, a larger set of actions designed to achieve such a development at that location or (2) that, at the time the preliminary review was being conducted, one or more developers had expressed any interest in developing a multitenant shopping center at that location, much less taken any steps toward initiating it.

■ Second, we note that the assertion in Wal-Mart's opening brief that such a shopping center is "inevitable" (or, at least, reasonably foreseeable) is not supported by a citation to the administrative record. (See Cal. Rules of Court, rule 14(a)(1)(C); *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1011 [113 Cal.Rptr.2d 625] [factual assertions in appellate briefs should be supported with specific cites to the record].) The assertion cannot, in itself, be treated as evidence because it is merely argument or unsupported opinion. (§ 21080, subd. (e)(2) [substantial evidence excludes "argument, speculation, unsubstantiated opinion or narrative"]; Guidelines, § 15384, subd. (a).)

Third, we note that the section in Wal-Mart's opening brief that addresses Guidelines section 15183 twice cites to page five of its law firm's November 20, 2003, letter to City's planning commission.[13] That page discusses transportation and traffic circulation and asserts the study by Kimley-Horn "shows that a Wal-Mart Supercenter would generate significantly fewer trips than would a multi-tenant shopping center containing the same facilities. A Wal-Mart Supercenter would generate 12,057 total daily trips, 42.8 percent less than the 21,069 total daily trips that the multi-tenant shopping center [containing the same facilities] could be expected to generate." In addition, the letter describes the report by TJKM as "concluding in part that a Wal-Mart Supercenter would result in anywhere from 19,160 to 51,921 fewer trips per week compared with the situation as it would exist absent a Wal-Mart Supercenter." Although this letter to the planning commission, the study by Kimley-Horn, and the report by TJKM all refer to the possibility that a multitenant shopping center containing the same facilities as would a Wal-Mart Supercenter will be constructed at the location where Wal-Mart wanted to build its facility, these documents merely assume such a multi-tenant shopping center will be built there. They are not substantial evidence for the proposition that adoption of the Ordinance caused the construction of such a shopping center to become reasonably foreseeable.

Fourth, despite the failure of the appellate briefs of Wal-Mart to reference the document in the administrative record as required by rule 14(a)(1)(C) of

---

[13] During oral argument, Wal-Mart argued that the letter itself was substantial evidence that the Ordinance would cause significant environmental effects. We reject this argument and hold that the assertions in the law firm's letter, like the assertions in an appellate brief, must be supported by substantial evidence. (See § 21080, subd. (e)(2).)

the California Rules of Court, we will consider whether the December 15, 2003, letter from Mehmet Noyan constitutes substantial evidence that development of a multitenant shopping center, containing the same facilities as would a Wal-Mart Supercenter, on the site where Wal-Mart wanted to build its facility, is reasonably foreseeable. Specifically, Noyan opined "it is more likely than not that a large supermarket of the type currently being operated by Winco and Food Maxx is the most probable occupant for the real property that is the subject of the Wal-Mart Supercenter proposal, if the . . . Supercenter is prohibited by the City." In other words, Noyan stated the belief that there is more than a 50 percent chance that a large supermarket is the most probable future occupant of the site. Noyan also opined that there was "considerable justification" for the four development scenarios used in the TJKM report.

Substantial evidence includes "expert opinion supported by facts" and excludes unsubstantiated opinion. (Guidelines, § 15384.) Noyan's opinion is not substantiated by any reference to any market study or expression of interest by any supermarket developer. Thus, it is not based on an existing intent or interest, but is based on generalized prospects. Noyan's opinion about the range of general prospects for the potential development of the site is supported by his review of the location, his years of experience as a real estate developer in the area, and his role in negotiating the acquisition of the site for Wal-Mart. In stating that there was considerable justification for the four development scenarios, however, Noyan made no reference to the existing zoning requirements that would have required a CUP for the large supermarket component in those scenarios. Under these requirements, City would have to approve the development of a large supermarket at the location. Such an approval is unlikely because a large supermarket at that regional shopping location would be inconsistent with City's stated policy of favoring the use of local-serving neighborhood centers for supermarket food sales.[14] Noyan's letter does not provide a factual basis for inferring that City would approve (or it is reasonably foreseeable City would approve) any one of the four development scenarios. This unaddressed contingency creates sufficient uncertainty over whether any of the scenarios would actually be implemented as to render those scenarios speculative rather than reasonably foreseeable.

In addition, vagueness in the opinion makes it difficult to interpret. Noyan's statement that it is more likely than not that a large supermarket is the most probable tenant if a supercenter is prohibited only means he believes there is more than a 50 percent chance that a large supermarket is the most

---

[14] Wal-Mart fails in its appellate briefing to distinguish between the development of a multitenant shopping center and a multitenant shopping center that includes a food supermarket. The studies upon which Wal-Mart relies—those that show an increase in number of vehicle trips over those that would be caused by development of a Wal-Mart Supercenter—compare such supercenters with alternative development patterns all of which include a large (60,000 square foot) supermarket.

probable future occupant. Without some context for comparing how that most probable future occupant relates to the entire range of possible future occupants, we cannot tell whether the "large supermarket" described as the most probable occupant is reasonably foreseeable or, instead, is only the most probable of a list of speculative alternatives.

Consequently, we conclude that Mr. Noyan's opinion is not substantial evidence supporting the inference that the building of a multitenant shopping center containing facilities comparable to those of a Wal-Mart Supercenter was reasonably foreseeable as a result of the adoption of the Ordinance.

### b. *Project-specific effects peculiar to the Ordinance*

Finally, regardless of whether the building of a multitenant shopping center at the site in question became reasonably foreseeable, the impacts of such a shopping center would not be "project-specific"[15] environmental effects "peculiar to" the adoption of the Ordinance as those terms are used in Guidelines section 15183, subdivision (a).

■ The usual and ordinary meaning of the term "peculiar to" may be derived from a dictionary. (See *Leavitt v. County of Madera* (2004) 123 Cal.App.4th 1502, 1514 [22 Cal.Rptr.3d 101] [dictionary definition gives the usual meaning of a word].) Webster's Third New International Dictionary (1986) page 1663 defines "peculiar" as "**1a**: belonging exclusively or esp. to a person or group . . . **3**: tending to be a characteristic of one only: distinctive."[16]

Applying these definitions, a physical change in the environment will be peculiar to the Ordinance if that physical change belongs exclusively or especially to the Ordinance or if it is characteristic of only the Ordinance. In general, these definitions illustrate how difficult it will be for a zoning amendment or other land use regulation that does not have a physical component to have a sufficiently close connection to a physical change to allow the physical change to be regarded as "peculiar to" the zoning amendment or other land use regulation.[17]

None of the physical changes advocated by Wal-Mart as reasonably foreseeable are peculiar to the Ordinance in the sense that those changes are

---

[15] We do not address the causal link inherent in the term "project-specific" effect, but it appears to be less restrictive than the causal link between a project and its direct or primary effects.

[16] Similarly, Merriam-Webster's Tenth Collegiate Dictionary (1999) defines "peculiar" as follows: "**1**: characteristic of only one person, group, or thing: distinctive **2**: different from the usual or normal: **a**: special, particular **b**: odd, curious **c**: eccentric, queer." (*Id.* at p. 856.)

[17] This difficulty may explain the relative simplicity of the provisions of subdivision (i) of Guidelines section 15183, which addresses rezoning actions and is quoted at the beginning of part III, *ante.*

"characteristic of only" the Ordinance or belong exclusively or especially to the Ordinance. Rather, the Ordinance is at least twice removed from those physical changes. The physical changes will not occur unless (1) a specific development project is proposed, (2) City grants its approval to that specific project, (3) the project is completed, and (4) customers visit the project. The intervening construction project and City approval prevent the impacts asserted by Wal-Mart from being regarded as "peculiar to" the Ordinance or its site.[18]

The only project-specific result that is peculiar to the adoption of the Ordinance is the elimination of one type of development, discount superstores. Thus, all of the development possibilities that existed before the adoption of the Ordinance, except the possibility of a discount superstore, also existed after the adoption of the Ordinance. Within that wide range of development possibilities, none of the remaining possibilities were promoted or encouraged to the detriment of another remaining possibility. Because the relative probability of the remaining development possibilities is unaltered by the Ordinance, when and if any one of those alternatives actually comes into being, it cannot be described by an alternative that was peculiar to the Ordinance for purposes of Guidelines section 15183.

The foregoing construction of the terms "peculiar to" and "project-specific" promotes efficiency by reducing delay and needless paperwork and, therefore, is consistent with the purpose underlying the streamlined review of Guidelines section 15183. (Remy, *supra*, at p. 533; see generally Guidelines, § 15006.) This construction means that the asserted physical changes in the environment caused by the project must be more closely connected to the project than to a subsequent, more specific project that will be subject to further environmental review. In contrast, Wal-Mart's construction and application of Guidelines section 15183 would result in "repetitive environmental studies" (Guidelines, § 15183, subd. (a)) where the subsequent project that is actually implemented does not align with the details that Wal-Mart contends are now reasonably foreseeable and should be used for a site-specific environmental review, which would undermine the efficiency of streamlined review.

■ Also, the foregoing construction is consistent with the view that environmental review documents should be general when they cover general possibilities and specific when the specifics of a project are reasonably foreseeable. Here, the EIR for City's general plan adequately covered, and continues to cover, the general possibility that the location will be developed.

---

[18] Wal-Mart has not argued the phrase "its site" means the site of the Ordinance is the location Wal-Mart selected for its supercenter. Nevertheless, whether the site of the Ordinance is that particular location or the entire area covered by the zoning amendments, the significant effects asserted by Wal-Mart are not project-specific effects peculiar to either "site."

Also, when a specific project is proposed for that location, its details will be presented to City for approval and City will be required to conduct another preliminary review to determine what additional environmental review, if any, is necessary for CEQA compliance. (See *No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 237 [242 Cal.Rptr. 37] [when route for pipeline was selected and the specifics of construction became known, a new EIR containing a detailed analysis would need to be prepared].)

■ In summary, the environmental impacts that Wal-Mart contends may occur because of physical changes within City's jurisdiction have not been shown to be reasonably foreseeable "project-specific . . . effects which are peculiar to the project or its site" for purposes of Guidelines section 15183. Thus, the provision covering rezoning action that is consistent with a general plan applies and further environmental review is unnecessary at this time. (Guidelines, § 15183, subd. (i).)

### 3. *Changes outside City*

■ Pursuant to subdivision (b)(3) of Guidelines section 15183, "potentially significant off-site impacts . . . which were not discussed in the prior EIR" must be examined in an initial study or other analysis. As noted previously, in considering what effects are potentially significant, an "indirect physical change is to be considered only if that change is a reasonably foreseeable impact which may be caused by the project. A change which is speculative or unlikely to occur is not reasonably foreseeable." (Guidelines, § 15064, subd. (d)(3).)

Wal-Mart asserts that "potentially significant off-site impacts" are present here because the construction of a Wal-Mart Supercenter outside the city limits of Turlock will result in reasonably foreseeable environmental effects that are "peculiar to" the Ordinance. This analysis, however, puts the cart before the horse. Before addressing the asserted environmental impacts of construction of a Wal-Mart Supercenter outside City's jurisdiction,[19] we must examine the evidence Wal-Mart has referenced to see whether it supports the conclusion that the construction is reasonably foreseeable.

In its opening brief, Wal-Mart cites to page five from its law firm's November 20, 2003, letter to the planning commission that stated: "By prohibiting Discount Superstores in the City of Turlock, the proposed ordinance and plan amendments would force such stores to locate in communities

---

[19] A similar asserted environmental impact, displacement of a housing development allegedly arising from a planning action, may be considered by the California Supreme Court in *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2005) 125 Cal.App.4th 810 [23 Cal.Rptr.3d 60], review granted April 13, 2005, S131484.

near the City of Turlock. Residents of the City would have to travel greater distances to take advantage of the lower prices and expanded product offerings that would be available . . . [and e]mployees too may face longer vehicle trips."

The November 20, 2003, letter did not disclose the facts from which it inferred that Wal-Mart would build a supercenter near but outside of City if it was not allowed to build within City's jurisdiction. Neither is the factual basis for such an inference disclosed in TJKM's report or Kimley-Horn's study. The only reference to the possibility of construction outside City is the statement in the letter that the Ordinance would force discount superstores to locate in communities around City, and this statement is not supported by a citation to any evidence. The statement in the letter is not, in itself, substantial evidence because it is "argument, speculation, unsubstantiated opinion or narrative." (§ 21080, subd. (e)(2); see Guidelines, § 15384, subd. (a).)

City is located in Stanislaus County. The record reveals that, during the process of enacting the Ordinance, and in response to Wal-Mart's assertion that the Ordinance would result in the building of a supercenter outside the city limits, City learned that "there are no proximate sites within Stanislaus County's jurisdiction that are appropriately zoned and have adequate urban service (utilities) that would provide a suitable alternative site." Wal-Mart labels this proposition "a red herring because it ignores the fact that Turlock is at the County border, and thus that numerous proximate off-site locations exist outside of Stanislaus County's jurisdiction in Merced County." As evidentiary support for this assertion, however, Wal-Mart references nothing more than two pages of maps contained in City's general plan that show City is located near the boundary between Merced and Stanislaus Counties. It hardly needs saying that, although the maps are evidence regarding the proximity of Merced County to City, they do not show that the construction of a Wal-Mart Supercenter in Merced County is reasonably foreseeable.

The quantity and quality of evidence presented in *County Sanitation, supra*, 127 Cal.App.4th 1544 to show that particular responses to the new sewage sludge restrictions were reasonably foreseeable stands in stark contrast to the absence of evidence in the administrative record in this case. In *County Sanitation*, the sanitation districts presented declarations of managerial-level employees who described the available options and the extent of the planning that had been done in anticipation of the possibility that the County of Kern would adopt the proposed ordinance. (*Id.* at pp. 1585–1586.) Also, under the circumstances of that case, a no-response or no-action alternative was not an option available to the sanitation districts because the continued production of sewage sludge by their treatment plants meant that their need to dispose of that

sludge was a near certainty and, thus, easily within the range of the reasonably foreseeable. (*Id.* at p. 1584.)

In contrast, Wal-Mart presented no declarations or other evidence regarding its plans to build a supercenter near City in response to the passage of the Ordinance. Also, unlike the sanitation districts, Wal-Mart has the option of responding to the Ordinance by taking no action at all—that is, it could choose not to build a supercenter near City.

As a matter of logic, we recognize that Wal-Mart's possible reactions can be divided into two categories—either Wal-Mart will build a supercenter near City or it will not. Each category is foreseeable. Nevertheless, substantial evidence must exist in the administrative record before a foreseeable alternative is *reasonably* foreseeable. Here, Wal-Mart simply assumed it would build a supercenter near City and failed to present evidence that rendered this possibility reasonably foreseeable. The building of a supercenter near City is an essential link in the causal chain that leads to the impacts on traffic and air quality alleged by Wal-Mart. Without this essential link, the causal chain is broken and the alleged impacts to traffic and air quality cannot reach the level of probability necessary to be regarded as reasonably foreseeable.

### C. *Environmental Effects Analyzed in Prior EIR*

Wal-Mart contends that the environmental effects of the Ordinance "[w]ere not analyzed as significant effects in a prior EIR on the . . . general plan . . . with which the project is consistent." (Guidelines, § 15183, subd. (b)(2).)

This contention is rejected based on our earlier determinations that (1) the off-site impacts asserted by Wal-Mart were not supported by enough evidence to be reasonably foreseeable, (2) the specific possibility of development of a multitenant shopping center where Wal-Mart had planned to build its supercenter was not reasonably foreseeable, and (3) to the extent that one could reasonably foresee development occurring at the location where Wal-Mart had planned to build its supercenter, it was general in nature and adequately covered by City's general plan and related EIR.

### D. *Potentially Significant Off-site Impacts*

Wal-Mart asserts that "potentially significant off-site impacts and cumulative impacts . . . not discussed in the prior EIR prepared for the general plan" (Guidelines, § 15183, subd. (b)(3)) require preparation of an initial study or an EIR.

This contention is rejected based on our earlier determination that the off-site impacts asserted by Wal-Mart were not reasonably foreseeable under the evidence contained in the administrative record. Therefore, the fact that the prior EIR did not discuss those impacts is of no consequence in this case.

### E. Conclusion

For all of the reasons stated, we conclude that further environmental review was unnecessary under Guidelines section 15183.[20]

## IV. Enactment of Ordinance Did Not Exceed Police Power of City

Under the California Constitution, a "city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) Wal-Mart contends that City exceeded this authority because the Ordinance (1) targets Wal-Mart, is designed to suppress economic competition, and is not reasonably related to the public welfare; and (2) has effects outside City, and is not a reasonable accommodation of competing interests.[21] Because it is neither our duty nor our option to second-guess City's determination that the Ordinance is needed to, and will, protect the public welfare, we reject Wal-Mart's contentions.

### A. Standard of Review

Wal-Mart challenged the Ordinance by way of a petition for writ of mandate pursuant to Code of Civil Procedure sections 1085 and 1094.5.[22] Traditional mandamus, pursuant to Code of Civil Procedure section 1085, was

---

[20] The factual examination undertaken to determine the applicability of Guidelines section 15183 might also support the conclusion that further environmental review of the Ordinance is unnecessary because the Ordinance is a subsequent activity covered by a program EIR in accordance with the provisions of Guidelines section 15168, subdivision (c). We do not, however, explicitly decide that question or others regarding the applicability of exemptions relied upon by City.

[21] Although Wal-Mart asserted it was targeted by the Ordinance, its action in superior court did not allege an equal protection claim under a "class-of-one" theory or other theory. (See *Village of Willowbrook v. Olech* (2000) 528 U.S. 562 [145 L.Ed.2d 1060, 120 S.Ct. 1073] [class-of-one theory recognized]; *Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597 [6 Cal.Rptr.3d 574] [equal protection claim survives demurrer].) Wal-Mart is pursuing constitutional claims under the due process clause (Ordinance is vague and uncertain), equal protection clause, and commerce clause in the United States District Court for the Eastern District of California. (*Wal-Mart Stores, Inc. v. City of Turlock* (E.D.Cal., Civ-F-04-5278 OWW DLB).)

[22] Wal-Mart also sought declaratory relief but has not pursued that as a separate remedy, either in the trial court or here. We will not discuss it further.

the proper remedy for the constitutional challenge to the Ordinance. (*Pan Pacific Properties, Inc. v. County of Santa Cruz* (1978) 81 Cal.App.3d 244, 253 [146 Cal.Rptr. 428]; see also *Gong v. City of Fremont* (1967) 250 Cal.App.2d 568, 572 [58 Cal.Rptr. 664] [administrative mandamus available only where evidentiary hearing before administrative agency was required].) ". . . The trial court reviews an administrative action pursuant to Code of Civil Procedure section 1085 to determine whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, . . . [Citations.] 'Although mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner, it will lie to correct abuses of discretion. [Citation.] In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.]' [Citation.]" (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995 [109 Cal.Rptr.2d 454]; see *American Federation of State, County & Municipal Employees v. Metropolitan Water Dist.* (2005) 126 Cal.App.4th 247, 261 [24 Cal.Rptr.3d 285].)

In a traditional mandamus action, while the trial court's findings on foundational factual matters are " 'conclusive on appeal if supported by substantial evidence . . . [t]he ultimate question[], whether the agency's decision was . . . unlawful . . . [is] essentially [a] question[] of law. With respect to th[is] question[] the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal.' " (*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1443 [282 Cal.Rptr. 819]; see *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169–1170 [56 Cal.Rptr.2d 223].)

 With respect to the enactment of zoning ordinances, "[i]n deciding whether a challenged ordinance reasonably relates to the public welfare, the courts recognize that such ordinances are presumed to be constitutional, and come before the court with every intendment in their favor. [Citation.] '. . . [S]o long as it remains a "question upon which reasonable minds might differ," there will be no judicial interference with the municipality's determination of policy.' " (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 604–605 [135 Cal.Rptr. 41, 557 P.2d 473].) A land use restriction is valid "if it is fairly debatable that the restriction in fact bears a reasonable relation to the general welfare." (*Id.* at p. 601.) Nonetheless, an ordinance is invalid if it is " 'arbitrary and unreasonable, having no substantial

relation to the public health, safety, morals, or general welfare.' " (*Id.* at p. 604.)

## B. *The Ordinance Is Reasonably Related to Public Welfare*

City contends the Ordinance is a valid measure designed to protect against urban/suburban decay, increased traffic, and reduced air quality, all of which, according to City, can result from the development of discount superstores. The trial court agreed and found the Ordinance was rationally related to a legitimate public purpose. We agree with the trial court's very well-reasoned conclusions (1) that the administrative record is replete with evidence of "the city's concerns with traffic and [urban/suburban decay]" that might arise from the development of discount superstores, and (2) that it is clear the "fairly debatable" standard has been met.

Wal-Mart does not argue that its supercenters do not have significant environmental effects, or even that they do not produce the results City fears—to wit, urban/suburban decay, increased traffic, and reduced air quality. Instead, Wal-Mart argues the lack of a rational relationship between those concerns and the Ordinance is demonstrated by the fact that, while the Ordinance bans superstores entirely, it permits the development of alternative multitenant shopping centers which, according to the evidence, have even greater negative environmental effects. The alternative developments to which Wal-Mart refers are those discussed in the TJKM report of November 20, 2003, all of which include a grocery supermarket of 60,000 square feet or more.[23] It is clear from the record, however, that City decision makers did not ignore either the TJKM report, the statistics it presented, or the idea Wal-Mart sought to convey before enacting the Ordinance. Rather, they appear to have agreed with City's planning staff that "[w]hile any large-scale retail store can draw customers with low prices and a wide selection of goods, the big box grocers present a unique threat because of the inclusion of discount retail and full-service grocery under a single roof."

Further, it must be noted that City does have planning control, through the CUP process, over the prospective development of discount

---

[23] The supercenter and three alternative development scenarios are:

"1. Wal-Mart Supercenter, 220,000 square feet of gross floor area including a 60,000 square foot grocery store

"2. Wal-Mart Discount Store, 160,000 square feet of gross floor area plus an unattached supermarket of 60,000 square feet—either next door or at another site completely

"3. Shopping Center with a 60,000 square foot supermarket anchor tenant with a total floor area of 220,000 square feet

"4. Discount Club Store such as Costco at 160,000 square feet plus an unattached supermarket of 60,000 square feet[.]"

stores, discount clubs, and supermarkets of 60,000 square feet or more.[24] And City has placed on record its view that the development of large grocery supermarkets in regional shopping centers raises environmental concerns and is undesirable. Wal-Mart cites no authority to support the proposition that a municipality must address all similar concerns related to the general welfare by the same means or in the same way.

With respect to Wal-Mart's claim of anticompetitive purpose, we agree with the trial court that, while the Ordinance likely will have an anticompetitive effect on the grocery business in City, that incidental effect does not render arbitrary an Ordinance that was enacted for a valid purpose. (See *Van Sicklen v. Browne* (1971) 15 Cal.App.3d 122 [92 Cal.Rptr. 786] [city denied CUP for gas station on ground, among others, that neighborhood already was adequately served by gas stations].) While zoning ordinances may not legitimately be used to control economic competition, they may be used to address the urban/suburban decay that can be its effect. (*Ensign Bickford Realty Corp. v. City Council* (1977) 68 Cal.App.3d 467, 477–478 [137 Cal.Rptr. 304]; cf. *Bakersfield Citizens for Local Control v. City of Bakersfield*, *supra*, 124 Cal.App.4th at p. 1205 ["in appropriate circumstances CEQA requires urban decay or deterioration to be considered as an indirect environmental effect of a proposed project"].)

Neither do we find that the Ordinance was enacted for the purpose of targeting Wal-Mart. The Ordinance does not single out Wal-Mart but, instead, prohibits all discount superstores within City's boundaries. The record demonstrates, to be sure, that Wal-Mart's prospective competitors, and some of its detractors, did lobby City officials regarding enactment of the Ordinance. As City points out, however, it is well-established that courts must "eschew inquiry into what motivated or influenced those who voted on . . . legislation." (*Board of Supervisors v. Superior Court* (1995) 32 Cal.App.4th 1616, 1623 [38 Cal.Rptr.2d 876].) "[T]he validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or [the] influences upon, the legislators who enacted the measure." (*City and County of San Francisco v. Cooper* (1975) 13 Cal.3d 898, 913 [120 Cal.Rptr. 707, 534 P.2d 403]; see also *Ensign Bickford Realty Corp. v. City Council*, *supra*, 68 Cal.App.3d at p. 478.)

Further, the simple fact that Wal-Mart was the first company to feel the effect of the Ordinance is not sufficient to establish that Wal-Mart was targeted in any unconstitutional manner. If that fact were enough to require a finding that a local governmental entity had exceeded its police power, then

---

[24] The record includes a copy of section 9-3-302 of City's Municipal Code, which provides, amongst other things, that "Food & beverage sales" in stores of 10,000 square feet or more, are either not permitted or are permitted only with a CUP in all zoning categories.

local government could never react to new situations brought to its attention by a specific proposal without having that reaction invalidated under the claim that it "targeted" the specific proposal. In short, local governments need the flexibility to react to specific proposals for a new kind of development not previously contemplated where such a development will or may have harmful consequences to the locality's legitimate planning objectives.

In summary, the police power empowers cities to control and organize development within their boundaries as a means of serving the general welfare. City legitimately chose to organize the development within its boundaries using neighborhood shopping centers dispersed throughout the city. The Ordinance is reasonably related to protecting that development choice.[25]

### C. *Effect on Surrounding Communities Was Not Shown to Be Significant*

 Consideration of the general welfare must, in certain instances, extend beyond the geographical limits of the local governmental entity adopting the ordinance. (*Associated Home Builders etc., Inc. v. City of Livermore, supra,* 18 Cal.3d at p. 601.) Specifically, "if a restriction significantly affects residents of surrounding communities, the constitutionality of the restriction must be measured by its impact not only upon the welfare of the enacting community, but upon the welfare of the surrounding region." (*Ibid.*)

Based on our earlier evaluation of the evidence of reasonably foreseeable physical changes in the environment the Ordinance may cause outside City's jurisdiction, we conclude that the evidence presented does not establish that the Ordinance will "significantly affect[] residents of surrounding communities." (*Associated Home Builders etc., Inc. v. City of Livermore, supra,* 18 Cal.3d at p. 601.) Therefore, Wal-Mart has failed to establish this aspect of its challenge to City's exercise of its police power.

---

[25] Wal-Mart contends this court's recent decision in *Hernandez v. City of Hanford* (2006) 137 Cal.App.4th 1397 [40 Cal.Rptr.3d 905] supports its argument that there was no rational basis for the Ordinance's distinction between discount superstores and equivalent multitenant developments. In *Hernandez,* this court held that a zoning amendment that allowed department stores over a certain size to sell furniture on a limited basis while prohibiting furniture sales by smaller retailers violated the smaller retailers' equal protection rights. The disparate treatment of the retailers was not rationally related to the purpose of the amendment. (*Hernandez,* at p. 1404) *Hernandez* is distinguishable because the Ordinance is reasonably related to furthering a legitimate policy choice for organizing development within City. A less important difference is that no equal protection claim has been raised in this case. (See fn. 21, *ante.*)

## DISPOSITION

The order denying the writ of mandate is affirmed. Respondents to recover their costs on appeal.

Harris, Acting P. J., and Gomes, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 12, 2006, S143488. Chin, J., did not participate therein.