[No. S143287. June 7, 2007.]

ADRIAN HERNANDEZ et al., Plaintiffs and Appellants, v.
CITY OF HANFORD et al., Defendants and Respondents.

## COUNSEL

Motschiedler, Michaelides & Wishon and Russell K. Ryan for Plaintiffs and Appellants.

Deborah J. La Fetra and Timothy Sandefur for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Howard Rice Nemerovski, Canady Falk & Rabkin, Steven L. Mayer; Kahn, Soares & Conway, Michael J. Noland and Rissa A. Stuart for Defendants and Respondents.

Hanson Bridgett Marcus Vlahos & Rudy and Thomas B. Brown for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

GEORGE, C. J.—This case involves a constitutional challenge to a zoning ordinance enacted by the City of Hanford in 2003. In order to protect the economic viability of Hanford's downtown commercial district—a prominent feature of which is a large number of regionally well-regarded retail furniture stores—the challenged ordinance generally prohibits the sale of furniture in another commercial district in Hanford (currently designated the Planned Commercial or PC district) that contains a large shopping mall in which several department stores as well as other retail stores are located. At the same time, the ordinance creates a limited exception to the general prohibition on the sale of furniture in the PC district, permitting large department stores (those with 50,000 or more square feet of floor space) located within

that district to sell furniture within a specifically prescribed area (occupying no more than 2,500 square feet of floor space) within the department store.

The owners of a "stand-alone" home furnishings and mattress store located within the PC district, who wished to sell bedroom furniture along with mattresses and home accessories (such as lamps and carpets) in their store, brought this action contesting the validity of the foregoing provisions of the zoning ordinance. The trial court rejected the constitutional challenge, but the Court of Appeal disagreed with the trial court's determination. The Court of Appeal concluded that although the ordinance's general prohibition of the sale of furniture in the PC district was reasonably related to a legitimate governmental interest—the preservation of the economic viability of the downtown commercial district—the ordinance's exception permitting limited furniture sales only by large department stores in the PC district violated equal protection principles by drawing an unwarranted distinction between large department stores and other retail stores located within the PC district. The appellate court reasoned that "when all retailers limit the furniture display space in compliance with the ordinance to the permitted 2,500 square feet, the difference in total floor space between the retailers is largely irrelevant. Thus, the disparate treatment of these similarly situated retailers based on square footage is not rationally related to the purpose behind the ordinance and is unconstitutional as a violation of equal protection." We granted the city's petition for review to consider the validity of the Court of Appeal's determination that the ordinance is unconstitutional.

For the reasons discussed below, we conclude that the Court of Appeal erred in finding the ordinance unconstitutional. As we shall explain, the appellate court's analysis fails adequately to take into account the *two* legitimate purposes underlying the ordinance in question: (a) the objective of protecting and preserving the economic viability of the city's downtown commercial district by generally prohibiting within the PC district a particular retail activity—the sale of furniture—that is a prominent feature of the downtown commercial district, *and* (b) the objective of attracting to, and retaining within, the city's PC district the type of large department stores (which typically carry furniture) that the city views as essential to the economic viability of the PC district. Restricting the ordinance's limited exception for the sale of furniture within the PC district to sales by large department stores—and only such stores—is rationally related to the second of these legislative purposes served by the ordinance.

Accordingly, we conclude that the decision rendered by the Court of Appeal, invalidating the zoning ordinance here at issue, must be reversed.

## I

In 1989, the City of Hanford amended its general plan to provide for a new commercial district in the vicinity of 12th Avenue and Lacey Boulevard. This new district originally was designated the "Regional Commercial" district but later was renamed the Planned Commercial or PC district. The district encompassed several hundred acres of land and was intended to accommodate the location of malls, large "big box" stores, and other retail uses.

At trial, Jim Beath, the city's community development director, testified regarding the background of the city's adoption of the new district in 1989. (Beath had been the city's community development director in 1989 and continued to occupy that position at the time of trial in 2005.) Beath explained that when the city was considering the creation of the new district in 1989, it was concerned that the extent of anticipated commercial development in the proposed district might well have a negative effect on the city's downtown commercial district. In light of that concern, the city council appointed the Retail Strategy Development Committee (the Committee) "made up of people from the mall area as well as the downtown district and other citizens." The Committee was asked to propose land use rules for the new district that would "provide for the large box and other kinds of retail use that the City . . . had grown to need and yet still make sure that [the new district] didn't have a negative impact on the downtown district."

The Committee ultimately recommended that certain designated uses generally not be permitted in the new district, and Beath testified that those uses "were ones that were already established in the downtown district that they didn't want to see removed from the downtown district and relocate[d] out at the planned commercial district, and those were car dealerships, banks, professional offices, and furniture stores." In establishing the new district, the city council limited the uses that were to be permitted in that district in line with the Committee's recommendations.

Accordingly, as relevant here, the 1989 ordinance included department stores and the sale of home furnishings within the list of permitted uses within the new district, but did not include furniture stores or the sale of furniture as a permitted use. The 1989 ordinance, however, did not specifically define "department store" or "home furnishings," and did not explicitly state whether department stores located within the new district would or would not be permitted to sell furniture. (As we shall see, from the outset the department stores that were built and operated within the new district did sell some types of furniture, but the validity of this practice of the department stores under the terms of the 1989 ordinance apparently never was challenged or judicially resolved prior to the controversy that led to the enactment of the 2003 amendment here at issue.)

In the fall of 2002, more than a decade after establishment of the PC district, plaintiffs Adrian and Tracy Hernandez leased space in a building located in the PC district with the intent to establish a new business at that location to be called Country Hutch Home Furnishings and Mattress Gallery (hereafter Country Hutch Home Furnishings). For more than 10 years preceding the time they proposed to start this new business, plaintiffs had owned and operated a retail furniture store, the Country Hutch, that was located in the city's downtown commercial district.[1] In planning for the new store, plaintiffs intended to sell mattresses, home accessories, and some bedroom furniture at their new location in the PC district.

Prior to the opening of the new business, Tracy Hernandez met with Beath, the city's community development director, who informed her that under the governing zoning ordinance the new store would not be permitted to sell furniture. Although the then existing provisions governing the PC district did not contain any specific definition of the term "home furnishings"—the sale of which was a permitted use in the PC district—Beath testified that the city, as an administrative matter, uniformly had interpreted "home furnishings" as used in the ordinance to mean "accessories to furniture, . . . not furniture," that is, objects such as "lamps, wall hangings, mirrors, blinds, drapes, things of that sort." Beath testified that he informed Tracy Hernandez of that limitation well before the opening of the store. In her testimony, Tracy Hernandez acknowledged that Beath had informed her that the proposed store in the PC district could not sell furniture.

In November 2002, the city adopted a number of amendments to its general plan and zoning ordinance, including a revision in the list of permitted uses in the PC zone changing the term "home furnishings" to "home furnishing accessories (not furniture)." Beath testified at trial that this amendment did not represent a substantive change in the meaning of the term "home furnishings" or the manner in which that term had been applied by city officials, but simply was intended "to clarify it by adding the words 'not furniture.' "

From November 2002 to January 2003, plaintiffs continued with their plans to open and operate the Country Hutch Home Furnishings store in the PC district, and in February 2003 the city issued a certificate of occupancy to

---

[1] At trial, Tracy Hernandez referred only to her and her husband's ownership of one furniture store in downtown Hanford, the Country Hutch. Other documents in the record indicate that in 2002 there were two furniture stores with similar names—the Country Hutch and the Country Hutch Outlet—among the more than one dozen retail furniture stores located in downtown Hanford. The record does not indicate whether plaintiffs owned the Country Hutch Outlet as well as the Country Hutch.

plaintiffs, stating that the building in question could be used to sell "home furnishing accessories," but also specifying that this term excluded "all types of furniture."[2]

After receiving the certificate of occupancy, plaintiffs opened the Country Hutch Home Furnishings store. Soon thereafter a city inspector, citing plaintiffs for violating the zoning ordinance by offering furniture for sale in their new store, instructed them to remove all of the furniture from the store. Plaintiffs thereafter sent a letter to the members of the Hanford City Council, complaining that the zoning code was being applied in a discriminatory fashion because numerous department stores in the PC district were selling furniture and had not been cited by the city, while plaintiffs were cited for engaging in the same conduct.

On March 4, 2003, one week after receiving plaintiffs' letter, the city council held a "study session" to consider the issues raised by plaintiffs' letter. Plaintiffs, as well as representatives of the downtown furniture stores and representatives of the PC district department stores, attended and participated in the study session. Prior to the March 4 session the city's community development department, conducting a survey of the merchandise offered for sale in the existing large department stores located in the PC district, found that each of those stores currently was selling "some type of furniture"— generally, either furniture that was "purchased in a box and requires some assembly" or patio furniture.[3] At the session, Beath informed the city council that he believed it was advisable to consider revising the applicable zoning ordinance to clarify whether, and to what extent, furniture could be sold in the PC district, either by department stores or other retail stores. Representatives of the downtown furniture stores maintained that the zoning ordinance's general prohibition on sales of furniture in the PC district was vital to the

---

[2] The relevant condition of the certificate of occupancy stated in full: "Subject to obtaining any and all required approvals from the City of Hanford, the merchandise that may be sold at the site is limited to that merchandise identified in Section 17.28.040 of the Hanford Municipal Code, a copy of which is attached hereto. The term 'Home Furnishing Accessories' is defined as household decorative items that accompany furniture in the decorating of room[s]. Examples include, bedding (including mattresses and bed frames), mirrors, artwork and similar accessory items. Excluded from the definition of 'Home Furnishing Accessories' are all types of furniture."

[3] Specifically, the department's survey found that (1) Wal-Mart carried a variety of computer and entertainment centers, bookcases, tables, chairs, and patio furniture, all of which "is purchased in a box and requires some assembly"; (2) Home Depot and Sears carried only patio furniture; (3) Gottschalks carried only mattresses with headboards and footboards, although at one time the store also had sold chairs and sofas; and (4) Target, which was soon to open a store in the PC district, "displays and sells similar boxed furniture items as Wal-Mart."

The department's report also stated that "[t]he PC zone allows warehouse type stores such as Sam's Club and Costco which sell furniture typically found in a full scale furniture store." The report did not indicate, however, whether any warehouse-type store actually was located in the city's PC zone at that time.

economic health of the city's downtown district and should be retained and uniformly enforced. A representative of the mall maintained that the type of furniture currently sold in the existing department stores in the PC district differed from the furniture sold in the downtown furniture stores and should remain locally available through the department stores. At the conclusion of the session, the council instructed the city staff to draft a proposed revision of the ordinance to clarify its application, and in addition to inform the department stores in the PC district that, pending the city's consideration of possible changes to the zoning ordinance, those stores would have to remove all furniture from their display areas and refrain from selling any furniture (other than outdoor or patio furniture).[4]

Pursuant to the city council's direction, after the March 4 study session city employees informed the department stores in the PC district that they were required to remove all furniture (other than outdoor or patio furniture) from display and to refrain from selling such furniture pending the city's consideration of changes to the applicable zoning ordinance. During the next four months, the staff of the community development department, after soliciting input from the owners and managers of all of the affected stores in the PC and downtown commercial districts, submitted a series of proposed amendments relating to this issue, in response to changing directives of the city council at monthly study sessions that were held from April to July 2003. The various alternatives were debated vigorously by the directly affected businesses, with representatives of the downtown business district emphasizing the critical importance for the city's overall general welfare of preserving the economic viability of that district, and representatives of the large department stores located in the PC district observing that their stores had offered some furniture for sale for the past decade without having a negative impact on Hanford's downtown furniture stores,[5] that virtually all of their sister stores in other locations contained furniture departments, and that the elimination of furniture departments in the department stores in Hanford could result in a substantial reduction of revenue for the city (by virtue of lost sales tax receipts) as well as for the individual stores.

At one point during this process, a representative of the downtown furniture stores stated that those stores would not object to an amendment to the PC zoning provisions permitting department stores to continue selling ready-to-assemble furniture in the PC district as the department stores had done in the past, so long as a specific, mutually agreeable definition of

[4] At the March 4 session, the consensus of the council members was that the existing provisions of the ordinance should not be interpreted to prohibit the sale of outdoor or patio furniture.

[5] The record indicates that the number of retail furniture stores in Hanford's downtown business district had increased from five stores in 1989 to 13 stores in 2003.

ready-to-assemble furniture was included within any such amendment. In response, the council directed the department staff to attempt to draft an amendment that would include a workable definition of ready-to-assemble furniture and that would permit such furniture to be sold at stores within the PC district, but limiting such sales activity to 5 percent of a store's floor space. After both the city staff and the affected businesses had devoted considerable time and effort to fashioning such a measure, however, it was determined that a definition of ready-to-assemble furniture that could be sold in the PC district could not be agreed upon by the affected parties, and that even if a mutually agreeable definition could be fashioned, it would be extremely difficult as a practical matter for city employees to enforce such a provision.[6]

Ultimately, on July 15, 2003, the city council adopted the amendment to the city zoning provisions relating to the sale of furniture in the PC district that is challenged in this case, Hanford Ordinance 03-03 (Ordinance No. 03-03).

Section 1 of Ordinance No. 03-03 adds definitions of "department store," "furniture," and "home furnishing accessories" to the general zoning provisions of the Hanford Municipal Code. "Department store" is defined as a retail store of at least 50,000 square feet "within which a variety of merchandise is displayed . . . for sale in departments," and the section further provides that a department store within the PC district may display and sell furniture in only one location (and on only one level within that location) having a total floor space of no more than 2,500 square feet. "Furniture" is defined as "the things placed in a room which equips it for living," but "[h]ome appliances, outdoor/patio furniture, wall cabinets, garage storage units and home furnishing accessories as defined in this [s]ection" are excluded from the definition of furniture for purposes of the zoning law. "Home furnishing accessories," in turn, are defined as "compl[e]mentary or decorative items placed in a room to accentuate the furniture," such as "curtains, draperies, blinds, . . . mirrors, pictures, . . . rugs, vases, . . . floor lamps, [and] table lamps," but as not including furniture.

---

[6] In the process of attempting to arrive at a mutually agreeable definition of ready-to-assemble furniture that could be sold in the PC district, the downtown furniture stores expressed the view that any acceptable definition would have to limit its reach to furniture that was constructed of specific kinds of material ("from Melamine and particle board and does not include furniture with wood veneers or high pressure laminates"). A letter subsequently submitted by the downtown merchants stated that "[a]s we've examined the proposed 5% RTA [ready-to-assemble] modification [of the ordinance], we find that a good working definition of RTA would be hard to determine (since everyone defines it differently) and we believe it would be nearly impossible to enforce."

Section 2 of Ordinance No. 03-03 adds as permissible uses within the PC district: "Department Stores" as defined in the ordinance, "Home Furnishing Accessories" as defined in the ordinance, and "Stores, which sell mattresses and metal bed frames with basic headboards and footboards that do not include shelves, drawers or sitting areas." Finally, section 3 of the ordinance adds a paragraph to the PC zoning provisions that specifically states: "The sale of furniture is prohibited in the PC zone district except by Department Stores in accordance with the definition of Department Stores" as set forth in the ordinance.[7]

Accordingly, the ordinance in question generally prohibits the sale of furniture in the PC district, but at the same time creates a limited exception

---

[7] Ordinance No. 03-03 reads in full:
"**Section 1:**
"Section 17.04.030 of Chapter 17.04 of Title 17 of the Hanford Municipal Code is hereby amended to add the following definitions:
" 'Department Store' means a retail store measuring 50,000 square feet or more within the inside walls of such retail store, and within which a variety of merchandise is displayed and arranged for sale in departments within the store. Examples of types of department stores are: Wal-Mart, K-Mart, Costco, Sam's Club, Home Depot, Orchards, Target, Sears, Mervyn's, Penny's, Gottschalks and Kohls. A department store located in the Planned Commercial District may sell furniture in only one department in the department store and the furniture for sale must be displayed in only one location in the department. The total floor space area of the one location in the department where the furniture for sale is displayed shall not be larger than 2,500 square feet and shall be limited to only one display level.
" 'Furniture' means the things placed in a room which equips it for living. Home appliances, outdoor/patio furniture, wall cabinets, garage storage units and home furnishing accessories as defined in this Section 17.04.030 are excluded from the definition of furniture.
" 'Home Furnishing Accessories' means compl[e]mentary or decorative items placed in a room to accentuate the furniture. Examples of Home Furnishing Accessories are: curtains, draperies, blinds, shutters, mirrors, pictures, clocks (excluding grandfather or floor clocks), wall hangings, tapestries, carpet, rugs, vases, baskets, statues, flowers, floor lamps, table lamps and pictures and other similar items. Home Furnishing Accessories are not furniture.
"**Section 2:**
"Section 17.28.040 of Chapter 17.28 of Title 17 of the Hanford Municipal Code is hereby amended to add the following use:
"Department Stores as defined in Section 17.04.030.
"Home Furnishing Accessories as defined in Section 17.04.030.
"Stores, which sell mattresses and metal bed frames with basic headboards and footboards that do not include shelves, drawers or sitting areas.
"**Section 3:**
"Section 17.28.040 of Chapter 17.28 of Title 17 of the Hanford Municipal Code is hereby amended to add paragraph 6 as follows:
" '6. The sale of furniture is prohibited in the PC zone district except by Department Stores in accordance with the definition of Department Stores set forth in Section 17.04.030 of Chapter 17.04 of this Title 17.'
"**Section 4:**
"This ordinance shall take effect thirty (30) days after its passage, and shall be published once in the Hanford Sentinel within fifteen (15) days after its passage."

permitting a large department store within the PC district to display and sell furniture within a single location in the store measuring no more than 2,500 square feet.

Shortly after the ordinance was enacted, plaintiffs filed the present action against the city, challenging the validity of the ordinance on a number of grounds. Plaintiffs' complaint contended that the ordinance was invalid (1) because it was enacted for the primary purpose of regulating economic competition, and (2) because it violated the equal protection clauses of the federal and state Constitutions. After a bench trial, the trial court rejected plaintiffs' contentions and upheld the validity of the ordinance. With regard to plaintiffs' initial claim, the court concluded that the primary purpose of the ordinance was not the impermissible purpose of restricting or eliminating competition, but instead the valid objective of preserving the vitality of Hanford's downtown district while not discouraging large department stores from locating or remaining in the PC district. With regard to plaintiffs' equal protection claim, the court found that there was a rational basis for the ordinance's disparate treatment of large department stores and smaller retail stores like those owned by plaintiffs, because the city's expressed interest in encouraging large department stores to locate and remain within the PC district did not extend to smaller stores.

On appeal, the Court of Appeal reversed the trial court's decision. Although the appellate court agreed with the trial court that the ordinance's general prohibition of the sale of furniture in the PC district was reasonably related to the legitimate governmental purpose of preserving the character and vitality of the city's downtown commercial district, the Court of Appeal further held that "with the blanket 2,500-square-foot restrictions on furniture in the PC zone, the small retailer poses the same potential threat, if any, to the downtown merchants as the larger store. Thus, limiting the furniture sales exception to stores with more than 50,000 square feet is arbitrary. A rational relationship between the size classification and the goal of protecting downtown simply does not exist." In rejecting the city's contention that the ordinance's disparate treatment between large department stores and other stores was justified because "the department store exception benefits the community by making the PC zone attractive to large retailers," the Court of Appeal stated simply that "it is not a detriment to have smaller retailers, such as Country Hutch [Home Furnishings], in the PC zone. Thus, the goal of promoting the PC zone does not validate the ordinance."

We granted the city's petition for review.

## II

Before reaching the equal protection issue upon which the Court of Appeal based its decision, we turn first to the more general (and more sweeping) contention that plaintiffs raised below and upon which they continue to rely in this court—that the zoning ordinance at issue is invalid because the "primary purpose" of the ordinance's general prohibition of the sale of furniture in the PC district assertedly was to "regulat[e] economic competition." Although neither the trial court nor the Court of Appeal found the ordinance invalid on this basis, as we shall see, plaintiffs' claim that the city exceeded its authority under the police power by enacting a zoning ordinance that regulates or restricts economic competition apparently is based upon some ambiguous and at least potentially misleading language that appears in a number of zoning decisions of the Courts of Appeal. As we shall explain, despite some arguably ambiguous language the decisions in these cases plainly do not support plaintiffs' challenge to the validity of the zoning ordinance here at issue, and we shall attempt to clarify the language in question to avoid possible confusion in the future.

*Van Sicklen v. Browne* (1971) 15 Cal.App.3d 122 [92 Cal.Rptr. 786] (*Van Sicklen*) is the earliest in the series of relevant Court of Appeal decisions. In *Van Sicklen*, the petitioner landowners applied for a conditional use permit to construct an automobile service station, but the city denied the application on the ground, among others, that a proliferation of service stations already existed in the area and thus that there was no demonstrated need for an additional service station at that location at that time. On appeal, the landowners claimed the city had denied the use permit "for economic rather than planning considerations resulting in an invalid attempt to regulate competition through zoning laws." (15 Cal.App.3d at p. 127.) In analyzing this contention, the court in *Van Sicklen* stated: "Although cities may not use zoning powers to regulate economic competition [citing three out-of-state decisions], it is also recognized that land use and planning decisions cannot be made in any community without some impact on the economy of the community. As stated in *Metromedia, Inc.* v. *City of Pasadena*[ (1963)] 216 Cal.App.2d 270, 273 [30 Cal.Rptr. 731], 'Today, economic and aesthetic considerations together constitute the nearly inseparable warp and woof of the fabric upon which the modern city must design its future.' Taking cognizance of this concept we perceive that planning and zoning ordinances traditionally seek to maintain property values, protect tax revenues, provide neighborhood social and economic stability, attract business and industry and encourage conditions which make a community a pleasant place to live and work. Whether these be classified as 'planning considerations' or 'economic considerations,' we hold that so long as the primary purpose of the zoning ordinance is not to regulate economic competition, but to subserve a valid objective pursuant to a city's police powers, such ordinance is not invalid even though

it might have an indirect impact on economic competition." (*Van Sicklen, supra,* 15 Cal.App.3d at pp. 127–128.) The court in *Van Sicklen* then went on to uphold the city's denial of the use permit, concluding that "[i]ntensity of land use is a well-recognized and valid city concern and relates to both health and safety factors and to proper zoning practice" and "encompasses within its purview the degree of saturation in a particular area of land devoted to automobile service stations." (*Id.* at p. 128.)

■ The passage from *Van Sicklen* quoted above correctly recognized many of the numerous factors and interests, including economic considerations, that a municipality properly may take into account in fashioning zoning ordinances and making zoning decisions, and we agree with the court's determination upholding the particular zoning action challenged in that case. We believe, however, that some of the language in the above quoted passage from *Van Sicklen* is at least potentially misleading. First, the initial general statement that "cities may not use zoning powers to regulate economic competition" (*Van Sicklen, supra,* 15 Cal.App.3d at p. 127) is quite clearly overbroad. As one leading zoning treatise accurately observes: "[A]ll zoning has some impact on competition. [¶] The simple division of the community into districts has an inherent and profound effect on the real estate market, because some land is withdrawn from the commercial market and placed in the residential market. . . . Some competitive impact results from nearly every provision of the original zoning ordinance, and from each amendment. Accordingly, competitive impact alone cannot invalidate a zoning ordinance. A zoning ordinance which serves some established purpose of zoning is not necessarily invalid simply because it has the additional effect of limiting competition." (1 Anderson's American Law of Zoning (4th ed. 1996) § 7.28, p. 807; see, e.g., *Boone v. Redevelopment Agency of City of San Jose* (9th Cir. 1988) 841 F.2d 886, 890 ["The power to zone and rezone . . . by its very nature encompasses the power to exclude competition"].)

■ Second, we believe that the additional statement in the quoted passage—that "so long as the primary purpose of the zoning ordinance is not to regulate economic competition, but to subserve a valid objective pursuant to [the] city's police powers, such ordinance is not invalid even though it might have an indirect impact on economic competition" (*Van Sicklen, supra,* 15 Cal.App.3d 122, 128)—also is ambiguous and at least potentially misleading. That language could be interpreted to suggest that a zoning ordinance is valid *only* when the ordinance has merely an "indirect impact" on economic competition, and *never* when the regulation of economic competition is a direct and intended effect of the ordinance, even in instances in which a zoning ordinance uses the regulation of competition simply as a means or tool to achieve an authorized and valid *public* purpose—such as the preservation of an existing downtown commercial district—rather than to serve an impermissible *private* anticompetitive purpose or interest—such as securing a

financial advantage or monopoly position for the benefit of a favored business or individual or imposing a disadvantage on an unpopular business or individual. As so interpreted, the language would be inaccurate. As we shall see, although this language from *Van Sicklen* has been repeated in subsequent Court of Appeal decisions, those decisions have not invalidated zoning actions simply because such actions reasonably could be viewed as having more than a mere indirect impact on economic competition. Instead, the more recent decisions have upheld zoning actions even when regulation of economic competition reasonably could be viewed as a direct and intended effect of a challenged zoning action, so long as the primary purpose of the zoning action—that is, its principal and ultimate objective—is to achieve a valid *public* purpose such as furthering a municipality's general plan for controlled growth or for localized commercial development, rather than simply to serve an impermissible anticompetitive *private* purpose such as investing a favored private business with monopoly power or excluding an unpopular company from the community.

The case of *Ensign Bickford Realty Corp. v. City Council* (1977) 68 Cal.App.3d 467 [137 Cal.Rptr. 304] (*Ensign Bickford*) provides a good illustration of this point. In *Ensign Bickford*, the plaintiff owned property in the City of Livermore that originally had been zoned "CN," a classification permitting neighborhood commercial facilities, but that thereafter had been rezoned "RS-4," permitting residential use only. Having planned to construct a neighborhood shopping center on its property and already having obtained a commitment from a grocery store chain to be a major tenant, the plaintiff requested the city to rezone its property CN. Upon the recommendation of the city planning commission, the city council denied the request, explaining that the city recently had zoned property in another nearby area—the Springtown neighborhood, in which the city was attempting to encourage development—to permit the construction of a neighborhood shopping center and that the city did not believe that the residential population in the relevant area was sufficient to support two shopping centers. (68 Cal.App.3d at pp. 471–472.)

In response to the city's action, the plaintiff filed the lawsuit in *Ensign Bickford*. The trial court ruled in the plaintiff's favor, finding that the city's purpose in denying the plaintiff's application "was to encourage development of the Springtown CN zoned property by eliminating a competitive economic threat to such property, and that the council's decision was not predicated upon considerations of public health, welfare, safety or morals." (*Ensign Bickford, supra*, 68 Cal.App.3d at p. 472.)

On appeal, the Court of Appeal reversed. After quoting at length the passage from *Van Sicklen, supra*, 15 Cal.App.3d 122, 127–128, set forth above, the court in *Ensign Bickford* continued: "Here, the city council

determined that the area needed and would support one shopping center, and that to further the long-range development plan for the city, the shopping center should not be located on Bickford's property, but in Springtown. This would have the effect of encouraging residential and commercial development in that area. It would also undoubtedly have the effect of decreasing the market or lease value of [Bickford's] property. By its very nature, a zoning ordinance may be expected to depress the value of some land while it operates, in its total effect, to achieve an end which will benefit the whole community. . . . [¶] . . . Here, the city is attempting to regulate *where*, within the city, business will be developed. In furtherance of this legitimate end, it is necessary to permit business development in one area before allowing commercial development in another. The economic impact upon the property involved is only incidental. The primary purpose is clearly the reasonable regulation of land use. [Citation.] There is no evidence, nor can it be inferred, that the city council was attempting to permit commercial development on one parcel and deny it as to another for the purpose of creating a business monopoly or to unreasonably regulate the commercial development of the city. To the contrary, the council was regulating the commercial growth of the city as it related to the needs of the residential areas for that commercial development." (*Ensign Bickford, supra*, 68 Cal.App.3d at pp. 477–478.)

Accordingly, although the city's denial of the plaintiff's rezoning request in *Ensign Bickford* reasonably could be viewed as having the direct and intended effect of regulating or limiting competition (that is, precluding the potential competition that would have resulted from the construction of a competing shopping center on the plaintiff's property), the court in *Ensign Bickford* nonetheless upheld the validity of the city's action, recognizing that the primary purpose of the city's regulation of competition in this context was not to further or disadvantage a private business but instead was to serve the city's legitimate public interest in carefully planning and controlling the pace and location of growth within the city.[8]

---

[8] In *Carty v. City of Ojai* (1978) 77 Cal.App.3d 329 [143 Cal.Rptr. 506], the Court of Appeal similarly rejected a challenge to a city's action in rezoning property located at the outskirts of the city to prohibit the development of a shopping center on the property. Although the plaintiffs in that case did not challenge the rezoning as an improper regulation of competition, they did maintain that the city's action was "arbitrary and discriminatory." (*Id.* at p. 333.) In rejecting that claim, the court in *Carty*, noting that the city's general plan—which had been adopted many years earlier—recognized the potentially deleterious effect on the city's downtown commercial area that might result if private commercial development occurred in the outlying areas of the city rather than in the downtown area, concluded that "long before the adoption of [the challenged ordinance] the [city] officials acted to encourage and promote the orderly growth and development of their community in the manner recommended by the general plan. The adoption of the [rezoning ordinance] is consonant with that purpose." (77 Cal.App.3d at p. 339.)

The more recent case of *Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273 [41 Cal.Rptr.3d 420] (*Wal-Mart*) provides another apt example. In *Wal-Mart*, the City of Turlock enacted a zoning ordinance that, while permitting the operation of traditional "big box" discount stores in a designated district, prohibited the development, anywhere in the city, of so-called discount superstores—defined generally as large discount stores that include a full-service grocery department.[9] In explaining the rationale underlying the restriction on discount superstores, the ordinance set forth a series of facts or findings, stating in part that (1) " 'the Turlock General Plan . . . establishes locational requirements for the [regional and neighborhood] retail centers: encouraging a number of neighborhood centers equally dispersed throughout the city while encouraging a concentration of regional shopping centers along the Highway 99/Countryside Drive corridor' " (*id.* at p. 283); (2) the city's " 'General Plan policies promote and encourage vital neighborhood commercial districts that are evenly distributed throughout the city so that residents are able to meet their basic daily shopping needs at neighborhood shopping centers' " (*ibid.*); (3) " 'discount superstores compete directly with existing grocery stores that anchor neighborhood-serving commercial centers' " (*ibid.*); (4) " 'the establishment of discount superstores in Turlock is likely to negatively impact the vitality and economic viability of the city's neighborhood commercial centers by drawing sales away from traditional supermarkets located in these centers' " (*ibid.*); and (5) " 'smaller stores within a neighborhood center rely upon the foot traffic generated by the grocery store for their existence and in neighborhood centers where the grocery store closes, vacancy rates typically increase and deterioration takes place in the remaining center.' " (*Ibid.*)

■ Wal-Mart filed an action challenging the validity of the ordinance on a variety of grounds, including the contention that the ordinance exceeded the city's police powers because it was "designed to suppress economic competition, and is not reasonably related to the public welfare." (*Wal-Mart, supra,* 138 Cal.App.4th 273, 299.) In rejecting this argument, the Court of Appeal in *Wal-Mart* stated: "With respect to Wal-Mart's claim of anticompetitive purpose, we agree with the trial court that, while the Ordinance likely will

---

[9] The Turlock ordinance defined "discount stores" as " 'stores with off-street parking that usually offer a variety of customer services, centralized cashing, and a wide range of products. They usually maintain long store hours seven (7) days a week. The stores are often the only ones on the site, but they can also be found in mutual operation with a related or unrelated garden center or service station. Discount stores are also sometimes found as separate parcels within a retail complex with their own dedicated parking.' " (*Wal-Mart, supra,* 138 Cal.App.4th at p. 282.)

The ordinance defined "discount superstore" as a "discount store that exceeds 100,000 square feet of gross floor area and devotes at least 5 percent of the total sales floor area to the sale of nontaxable merchandise, often in the form of a full-service grocery department." (*Wal-Mart, supra,* 138 Cal.App.4th at p. 282.)

have an anticompetitive effect on the grocery business in [the City of Turlock], that incidental effect does not render arbitrary an Ordinance that was enacted for a valid purpose. [Citing *Van Sicklen, supra,* 15 Cal.App.3d 122.] While zoning ordinances may not legitimately be used to control economic competition, they may be used to address the urban/suburban decay that can be its effect. [Citing, among other cases, *Ensign Bickford, supra,* 68 Cal.App.3d 467, 477–478.]" (*Wal-Mart, supra,* 138 Cal.App.4th at p. 302.) ■ The appellate court in *Wal-Mart* concluded: "In summary, the police power empowers cities to control and organize development within their boundaries as a means of serving the general welfare. [The City of Turlock] legitimately chose to organize the development within its boundaries using neighborhood shopping centers dispersed throughout the city. The Ordinance is reasonably related to protecting that development choice." (*Wal-Mart, supra,* 138 Cal.App.4th at p. 303.)

Accordingly, although the zoning ordinance in *Wal-Mart, supra,* 138 Cal.App.4th 273, like the zoning action in *Ensign Bickford, supra,* 68 Cal.App.3d 467, reasonably could be viewed as having a direct and intended effect of regulating competition, the court in *Wal-Mart* nonetheless upheld the validity of the ordinance because the principal and ultimate objective of the ordinance's regulation of competition was to further the city's legitimate *public* interest in avoiding the "urban/suburban decay" that may result from the location of some types of large-scale commercial development in an outlying area of a municipality.

■ Our court has not previously had occasion to address the question whether a municipality, in order to protect or preserve the economic viability of its downtown business district or neighborhood shopping areas, may enact a zoning ordinance that regulates or controls competition by placing limits on potentially competing commercial activities or development in other areas of the municipality. More than a half-century ago, however, this court explained that "[i]t is well settled that a municipality may divide land into districts and prescribe regulations governing the uses permitted therein, and that zoning ordinances, when reasonable in object and not arbitrary in operation, constitute a justifiable exercise of police power." (*Lockard v. City of Los Angeles* (1949) 33 Cal.2d 453, 460 [202 P.2d 38]; see also *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 604–605 [135 Cal.Rptr. 41, 557 P.2d 473]; see generally Cal. Const., art. XI, § 7; Gov. Code, § 65800 et seq.) As the circumstances underlying the decisions in *Ensign Bickford, supra,* 68 Cal.App.3d 467, and *Wal-Mart, supra,* 138 Cal.App.4th 273, demonstrate, even when the regulation of economic competition reasonably can be viewed as a direct and intended effect of a zoning ordinance or action, so long as the primary purpose of the ordinance or action—that is, its

principal and ultimate objective—is not the impermissible *private* anticompetitive goal of protecting or disadvantaging a particular favored or disfavored business or individual, but instead is the advancement of a legitimate *public* purpose—such as the preservation of a municipality's downtown business district for the benefit of the municipality as a whole—the ordinance reasonably relates to the general welfare of the municipality and constitutes a legitimate exercise of the municipality's police power. (Accord, *Lockard v. City of Los Angeles, supra*, 33 Cal.2d 453, 466 ["in determining what uses should be permitted in the 12-block strip, the legislative body was, of course, entitled to consider the effect of such uses on the surrounding areas, and to weigh the possibility of injury to those areas by reason of permitting various types of activity as against the desirability of allowing such uses"]; see generally 1 Rathkopf, The Law of Zoning and Planning (rev. ed. 1998) § 2:20, pp. 2-59 to 2-61; Strom, *Land Use Controls: Effects on Business Competition II* (1980) 6 Zoning & Planning L.Rep. 41, 46.)[10] To the extent that any language in *Van Sicklen v. Browne, supra*, 15 Cal.App.3d 122, *Ensign Bickford Realty Corp. v. City Council, supra*, 68 Cal.App.3d 467, or *Wal-Mart Stores, Inc. v. City of Turlock, supra*, 138 Cal.App.4th 273, may be interpreted as inconsistent with this conclusion, such an interpretation is disapproved.[11]

---

[10] Numerous cases in other jurisdictions have upheld zoning ordinances that limit some or all commercial development in outlying locations in order to protect or strengthen the economic viability of a municipality's central business district. (See, e.g., *Jacobs, Visconsi & Jacobs v. City of Lawrence* (10th Cir. 1991) 927 F.2d 1111, 1119 ["[T]he district court correctly concluded that retaining the vitality of the downtown area was a legitimate interest of the city commission. Declining to rezone property in a manner that would threaten the vitality of the downtown retail area is rationally related to that purpose"]; *E & G Enterprises v. City of Mount Vernon* (Iowa Ct.App. 1985) 373 N.W.2d 693, 694 ["Mount Vernon's effort to preserve its downtown business area is a valid exercise of police power. . . . [P]reservation of that area promotes the public welfare, including the maintenance of property values"]; *Forte v. The Borough of Tenafly* (App.Div. 1969) 106 N.J. Super. 346 [255 A.2d 804, 806] ["May a municipality which wishes to preserve, rehabilitate and improve an established business area devoted chiefly to retail stores, zone the rest of the municipality against retail sales? We hold that it may"]; *Chevron Oil Company v. Beaver County* (1969) 22 Utah2d 143 [449 P.2d 989, 990] [county's refusal to rezone land in outlying area to permit "highway services" development was justified "on the ground that any tourist business which would go to the isolated junction area would be a loss to the established businesses of Beaver City"].)

[11] The case of *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004 [100 Cal.Rptr.2d 413], relied upon by plaintiffs and amicus curiae on behalf of plaintiffs, is entirely consistent with our conclusion. In that case, the plaintiff organization, which opposed the opening of a proposed Borders bookstore in the City of Davis, contended that the city had erred in interpreting its design review ordinance as not authorizing the city to consider the identity of a proposed tenant for a particular development as part of the design review process. In rejecting the plaintiff's contention, the Court of Appeal observed: "Zoning and building laws 'cannot be used unqualifiedly to restrict competition' [citation], or simply to shield existing businesses from competition [citations]. While valid zoning regulations may affect competition and have other economic effects, a city does not have carte blanche to exclude a retail merchant that it, or some of its residents, do not like." (83 Cal.App.4th at p. 1013.) Nothing in *Friends of Davis*

In the present case, it is clear that the zoning ordinance's general prohibition on the sale of furniture in the PC district—although concededly intended, at least in part, to regulate competition—was adopted to promote the legitimate public purpose of preserving the economic viability of the Hanford downtown business district, rather than to serve any impermissible private anticompetitive purpose. Furthermore, as in *Ensign Bickford, supra,* 68 Cal.App.3d 467, here the zoning ordinance's restrictions are aimed at regulating *"where,* within the city" (*id.* at p. 477), a particular type of business generally may be located, a very traditional zoning objective. Under these circumstances, we agree with the lower court's conclusion that the zoning ordinance cannot be found invalid as an improper limitation on competition.

## III

As noted above, although the Court of Appeal agreed that the challenged zoning ordinance's general prohibition on the sale of furniture in the PC district is permissible, that court concluded the ordinance in question violates the equal protection clause by limiting the exception created by the ordinance to only the sale of furniture by large department stores, and not making the exception available to other retail stores wishing to sell furniture within the same amount of square footage permitted for furniture sales by large department stores. The Court of Appeal found that, in this context, the ordinance's disparate treatment of large department stores and other retail stores is not constitutionally permissible.

■ In evaluating the Court of Appeal's resolution of this issue, we begin with the question of the appropriate equal protection standard applicable in this case. As explained in *Warden v. State Bar* (1999) 21 Cal.4th 628 [88 Cal.Rptr.2d 283, 982 P.2d 154], there are "two principal standards or tests that generally have been applied by the courts of this state and the United States Supreme Court in reviewing classifications that are challenged under the equal protection clause of the Fourteenth Amendment of the United States Constitution or article I, section 7, of the California Constitution. . . . 'The first is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a "discrimination" or differentiation of treatment between classes or individuals. It manifests restraint by the judiciary in relation to the discretionary act of a co-equal branch of government;

---

suggests that a city may not use its zoning power to limit a particular type of commercial activity in one or more parts of the city in order to protect and preserve the economic viability of the city's downtown commercial district.

in so doing it invests legislation involving such differentiated treatment with a presumption of constitutionality and "requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose." [Citation.] . . . Moreover, the burden of demonstrating the invalidity of a classification under this standard rests squarely upon *the party who assails it.*' " (*Warden, supra,* 21 Cal.4th at pp. 640–641.) This first basic equal protection standard generally is referred to as the "rational relationship" or "rational basis" standard.

As further explained in *Warden v. State Bar, supra,* 21 Cal.4th at p. 641, the second equal protection standard is " '[a] more stringent test [that] is applied . . . in cases involving "suspect classifications" or touching on "fundamental interests." Here the courts adopt "an attitude of active and critical analysis, subjecting the classifications to strict scrutiny. [Citations.] Under the strict standard applied in such cases, *the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." [Citation.]' " (*Warden, supra,* 21 Cal.4th at p. 641.) This second standard generally is referred to as the "strict scrutiny" standard.[12]

The zoning ordinance at issue in the present case does not involve suspect classifications or touch upon fundamental interests and thus, as the Court of Appeal recognized and as all parties agree, the applicable standard under which plaintiffs' equal protection challenge properly must be evaluated is the rational relationship or rational basis standard.

As noted above, in finding the exception set forth in the ordinance invalid under the rational relationship test, the Court of Appeal reasoned that "with the blanket 2,500-square-foot restrictions on furniture in the PC zone, the small retailer poses the same potential threat, if any, to the downtown merchants as the larger store. Thus, limiting the furniture sales exception to stores with more than 50,000 square feet is arbitrary. A rational relationship between the size classification and the goal of protecting downtown simply does not exist."

We disagree with the Court of Appeal's determination that the ordinance violates the equal protection clause. The Court of Appeal's conclusion

---

[12] In applying the federal equal protection clause, the United States Supreme Court has applied a third standard—"intermediate scrutiny"—"to discriminatory classifications based on sex or illegitimacy." (*Clark v. Jeter* (1988) 486 U.S. 456, 461 [100 L.Ed.2d 465, 108 S.Ct. 1910].) It is clear that that standard is inapplicable here.

effectively rests on the premise that there was only a single purpose underlying the challenged ordinance—the protection of furniture stores located in the downtown business district from potential competition by retail establishments conducting business within the PC district. Because the Court of Appeal was of the view that the disparate treatment in the ordinance's exception of large department stores and other stores was not rationally related to *that* purpose, the appellate court concluded the exception was invalid.

█ Both the terms and legislative history of the measure at issue disclose, however, that the ordinance was intended to serve *multiple* purposes: to protect the economic health and viability of the city's downtown furniture stores, but to do so in a manner that did not threaten or detract from the city's ability to attract and retain large department stores in the PC district. Past cases establish that the equal protection clause does not preclude a governmental entity from adopting a legislative measure that is aimed at achieving multiple objectives, even when such objectives in some respects may be in tension or conflict.

The United States Supreme Court's relatively recent decision in *Fitzgerald v. Racing Assn. of Central Iowa* (2003) 539 U.S. 103 [156 L.Ed.2d 97, 123 S.Ct. 2156] (*Fitzgerald*) demonstrates this point. In *Fitzgerald,* the court addressed the constitutionality of a 1994 Iowa statute that imposed a maximum tax rate of 20 percent on revenues generated by slot machines located on excursion riverboats, but imposed a maximum tax rate of 36 percent on revenues generated by slot machines located at racetracks. In describing the background of the statute, the high court in *Fitzgerald* explained that prior to 1989 Iowa had permitted only one form of gambling— parimutuel betting at racetracks—but that in 1989 the state authorized other forms of gambling, including the use of slot machines on riverboats, and at the same time imposed a maximum tax rate of 20 percent on revenues generated by the riverboat slot machines. Thereafter, in 1994, the state enacted the statute at issue in *Fitzgerald*—a provision that for the first time authorized racetracks to operate slot machines, imposed a maximum tax rate of 36 percent on revenues generated by the racetrack slot machines, and (while making other changes with regard to riverboat slot machines) left the maximum tax rate on riverboat slot machine revenue at 20 percent.

After the 1994 statute was enacted, a group of racetracks brought a state court action challenging the constitutionality, under the equal protection

clause, of the 20 percent/36 percent differential in maximum tax rates imposed on riverboat and racetrack slot machine revenues. The state trial court upheld the statute, but on appeal the Iowa Supreme Court, by a four-to-three vote, reversed the lower court decision. In reaching its conclusion, the majority opinion of the Iowa Supreme Court reasoned that the " 'differential tax completely defeats the alleged purpose' of the statute, namely, 'to help the racetracks recover from economic distress,' that there could 'be no rational reason for this differential tax,' and that the Equal Protection Clause consequently forbids its imposition." (*Fitzgerald, supra*, 539 U.S. at p. 106.) Thereafter, the United States Supreme Court granted certiorari and unanimously reversed the Iowa Supreme Court decision.

In holding that the challenged statute did not violate equal protection principles, the United States Supreme Court explained in *Fitzgerald* that the Iowa Supreme Court could not deny "that the Iowa law, like most laws, might predominantly serve one general objective, say, helping the racetracks, while containing subsidiary provisions that seek to achieve other desirable (perhaps even contrary) ends as well, thereby producing a law that balances objectives but still serves the general objective when seen as a whole." (*Fitzgerald, supra*, 539 U.S. at p. 108.) The high court continued in *Fitzgerald*: "Once one realizes that not every provision in a law must share a single objective, one has no difficulty finding the necessary rational support for the 20 percent/36 percent differential here at issue. That difference, harmful to the racetracks, is helpful to the riverboats, which, as respondents concede, were also facing financial peril . . . . And aside from simply aiding the financial position of the riverboats, the legislators may have wanted to encourage the economic development of river communities or to promote riverboat history, say, by providing incentives for riverboats to remain in the State, rather than relocate to other States. . . . Alternatively, they may have wanted to protect the reliance interests of riverboat operators, whose adjusted slot machine revenue had previously been taxed at the 20 percent rate. All these objectives are rational ones, which lower riverboat tax rates could further and which suffice to uphold the different tax rates." (*Fitzgerald, supra*, 539 U.S. at p. 109; accord, e.g., *Kadrmas v. Dickinson Public Schools* (1988) 487 U.S. 450, 462–463 [101 L.Ed.2d 399, 108 S.Ct. 2481] [" '[W]e will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement *of any combination of legitimate purposes* that we can only conclude that the legislature's actions were irrational' " (italics added)]; *U. S. Railroad Retirement Bd. v. Fritz* (1980) 449 U.S. 166, 181 [66 L.Ed.2d 368, 101 S.Ct. 453] (conc. opn. of Stevens, J.) [legislation often is the "product of multiple and somewhat inconsistent purposes that led to certain compromises"].)

Like the Iowa statute at issue in *Fitzgerald, supra*, 539 U.S. 103, the Hanford ordinance challenged here clearly was intended to serve multiple

purposes. The city desired to protect the economic viability of its downtown business district, but at the same time it did not wish to diminish the financial benefits of the PC district for the large department stores that it wanted to attract and maintain in that district. Because the city viewed large department stores as particularly significant elements of the PC district, and because the management of those stores had made clear the importance to them of retaining their ability to offer furniture sales that typically were offered by their sister stores in other locations, it was rational for the city to decide to provide an exception from the general prohibition on furniture sales in the PC district for such large department stores and only such stores. The circumstance that the city also decided to limit the exemption afforded to department stores by placing a square-foot limit on the area within each store in which furniture could be displayed does not in any manner detract from the rationality of limiting the exception to large department stores.

■ Accordingly, contrary to the Court of Appeal's determination, we conclude that the ordinance's differential treatment of large department stores and other retail stores is rationally related to one of the legitimate legislative purposes of the ordinance—the purpose of attracting and retaining large department stores within the PC district. The Court of Appeal's resolution of this issue, which would have required the city to extend the ordinance's 2,500-square-foot exception for furniture sales to *all* retail stores within the PC district, would have undermined the ordinance's overall objective of permitting the sale of furniture in the PC district only to the extent such activity is necessary to serve the city's interest in attracting and retaining large department stores in that district.[13]

---

[13] Plaintiffs alternatively contend that the amended ordinance is unconstitutional because the city arbitrarily singled them out for discriminatory treatment (see, e.g., *Village of Willowbrook v. Olech* (2000) 528 U.S. 562 [145 L.Ed.2d 1060, 120 S.Ct. 1073]), relying on the circumstance that the city's enactment of the amendment was triggered by plaintiffs' complaint that they were being treated differently from the large department stores located in the PC district. The trial court rejected this claim, and we agree with that court's conclusion. There is no indication the city's action was based upon hostility toward plaintiffs; the amended ordinance prohibits the sale of furniture in the PC district by *all* retail stores other than large department stores and does not single out plaintiffs' store for disparate treatment. As the Court of Appeal explained in *Wal-Mart, supra,* 138 Cal.App.4th 273, 302–303, in rejecting a similar claim proffered by Wal-Mart in that case: "[T]he simple fact that Wal-Mart was the first company to feel the effect of the Ordinance is not sufficient to establish that Wal-Mart was targeted in any unconstitutional manner. If that fact were enough to require a finding that a local governmental entity had exceeded its police power, then local government could never react to new situations brought to its attention by a specific proposal without having that reaction invalidated under the claim that it 'targeted' the specific proposal. In short, local governments need the flexibility to react to specific proposals for a new kind of development not previously contemplated where such a development will or may have harmful consequences to the locality's legitimate planning objectives."

## IV

In sum, the Court of Appeal erred in invalidating the ordinance at issue. The judgment of the Court of Appeal is reversed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.